[S. F. No. 15616. In Bank.—February 10, 1937.]

REUEL D. ROBBINS, Jr., et al., as Executors, etc., Appellants, v. PACIFIC EASTERN CORPORATION et al., Respondents.

[S. F. No. 15617. In Bank.—February 10, 1937.]

JOHN ARCHER et al., Appellants, v. PACIFIC EASTERN CORPORATION et al., Respondents.

[S. F. No. 15618. In Bank.—February 10, 1937.]

B. F. HALLIDAY, Appellant, v. AMERICAN TRUST COMPANY, Respondent, and 6 Consolidated Actions.

[S. F. No. 15619. In Bank.—February 10, 1937.]

RODETTE SECURITIES COMPANY, Appellant, v. AMERICAN TRUST COMPANY et al., Respondents, and 13 Consolidated Actions.

[S. F. No. 15620. In Bank.—February 10, 1937.]

REUEL D. ROBBINS, Jr., et al., Appellants, v. AMERICAN TRUST COMPANY et al., Respondents, and 43 Consolidated Actions.

[S. F. No. 15621. In Bank.—February 10, 1937.]

RALPH ASHER, Appellant, v. AMERICAN TRUST COMPANY et al., Respondents, and 104 Consolidated Actions.

[S. F. No. 15622. In Bank.—February 10, 1937.]

CHICHIZOLA ESTATE COMPANY, Appellant, v. AMERICAN TRUST COMPANY et al., Respondents.

242

Arthur B. Dunne, Lloyd M. Robbins, Carey Van Fleet, Kenneth R. McDougall, Treadwell, Laughlin & Treadwell, C. Harold Caulfield, Edward D. Keil, Robert T. Devlin, Devlin & Devlin & Diepenbrock, Dunne & Dunne, Derby, Sharp, Quinby & Tweedt, Heller, Ehrman, White & McAuliffe, Arnold C. Lackenbach, Fletcher Flaherty, John W. Preston, Clifford A. Russell, Golden W. Bell, Joseph J. Webb, Dinkelspiel & Dinkelspiel and Ralph McGee, for Appellants.

U. S. Webb, Attorney-General, Ralph O. Marron, Deputy Attorney-General, Robert T. Devlin, Devlin & Devlin & Diepenbrock, *Amici Curiae*, on behalf of certain Appellants.

Brobeck, Phleger & Harrison, John Francis Neylan, Stephen R. Duhring, Chickering & Gregory and Garret W. McEnerney for Respondents.

WASTE, C. J. —Plaintiffs instituted 173 actions in the court below for the purpose of having declared void a stock transaction in which they, together with many others, not parties here, participated. The trial court classified the actions into seven groups, and consolidated the cases within each group for trial. All of the cases were tried below substantially on the evidence introduced in S. F. No. 15,616, the so-called Robbins rescission action. From judgments adverse to plaintiffs, these appeals have been taken.

The dispute arises out of an exchange, or purported exchange, whereby plaintiffs and many others, as owners of stock in American Company, exchanged, or purported to exchange, their stock for stock in The Goldman Sachs Trading Corporation. Although the theories of the various complaints differ radically, and although the defendants are not the same in all the actions, it is fundamentally the theory of the plaintiffs that the exchange was void as to them for the reason that it was in violation of the Corporate Securities Act of California, the Trading Corporation having secured no permit to offer to sell, to sell, or to issue its stock in this state. The principal defendant, named in all 173 actions, is the American Trust Company, which company all plaintiffs seek to hold for the value of their American Company stock because of its activities, hereinafter described, in connection with the exchange. The alleged liability of this defendant exceeds $70,000,000. The Trading Corporation, the other party to the exchange, is named as defendant in only the Robbins rescission action (S. F. No. 15,616) and the Archer rescission action (S. F. No. 15,617), involving but two of the original 173 actions. As will later appear, other individuals and corporations are named as defendants in some of the actions.

The plaintiffs, prior to the exchange, collectively owned or represented approximately 46,000 shares of American Company stock, a part of approximately 516,000 shares that participated in the exchange.

Before discussing the factual background of this controversy some reference should be made to the principal corporate and individual actors in the transaction. All references, except where otherwise specified, are to the status of the parties described in the year 1929, and particularly in July, August and September of that year.

American Trust Company, defendant in all 173 actions, was and is a California banking corporation, with its head office and principal place of business in San Francisco, and with branch offices throughout the state. It had a capital stock of $10,000,000, divided into 100,000 shares of the par value of $100 each. This company never has had an office in New York or New Jersey, and never has qualified to do business in either of those states.

American Company, defendant in the Robbins and Archer rescission actions (S. F. No. 15,616 and S. F. No. 15,617) and in three of the 44 Robbins conversion actions (S. F. No. 15,620), was organized under California law in 1927, and had its principal place of business in San Francisco. In 1928 the American Company acquired all but 177 of the issued and outstanding shares of the American Trust Company (five qualifying shares of each of the thirty-five directors and two other shares were not presented for exchange), so that for all practical purposes the American Company, after 1928, was the owner of the American Trust Company. At the time of the transaction here involved the American Company had 649,292 outstanding shares, owned by about 8,500 stockholders, the vast majority of whom were California residents.

The Goldman Sachs Trading Corporation (name changed to Pacific Eastern Corporation in 1933), as already stated, is a defendant in but two of the 173 actions here involved. It was incorporated under the laws of Delaware in December, 1928, to do the business of an investing company. Its statutory office was Wilmington, Delaware, and its principal office and place of business was New York City. The trial court found in each of the actions, and such finding is not challenged, that this corporation "never had an office or place of business in the state of California". At incorporation its authorized capital was 2,500,000 shares without par value, later, in 1929, increased to 10,000,000 shares without par value. Upon its incorporation the Trading Corporation sold 1,000,000 of its shares at $100 each, and received into its treasury $100,000,000. The Goldman Sachs Trading Corporation is to be distinguished from Goldman Sachs & Co., a co-partnership doing business in New York as private bankers. This latter company is not a party to any of these actions. The co-part-

nership, however, organized and to a large extent controlled the Trading Corporation.

Pacific Coast Trust Company, not a party to these actions, but mentioned during the negotiations later discussed, was incorporated in New York in 1927. In 1929 its name was changed to Pacific Trust Company. Until August 12, 1929, the entire capital stock of this company was owned by the Trading Corporation. On August 13, 1929, the outstanding capital stock of the Pacific Trust Company was doubled, and one-half thereof sold to the public; the other one-half being held by the Trading Corporation.

Pacific American Company, Ltd., defendant in the Robbins and Archer rescission actions and in three of the Robbins conversion actions, was incorporated in Delaware in 1928 as an investment holding company. In November of 1928 this company qualified to do business in California, and since that time its principal place of business has been California. By July of 1929 the Trading Corporation had acquired all of the stock of the Pacific American Company. At the time of the transaction here in dispute the latter company, directly or indirectly, owned about 115,000 shares (approximately 17 per cent) of the stock of the American Company.

John D. McKee, defendant in 166 of the actions (all but the seven Halliday conversion actions, S. F. No. 15,618) was a director and chairman of the board of directors of both the American Company and the American Trust Company. He had been connected with the banking business, and with the American Trust Company, and its predecessors, for many years. It was he who was the moving spirit in and who managed the details of the exchange.

Defendants C. O. G. Miller (defendant in the fourteen Devlin conversion actions, S. F. No. 15,619), F. T. Elsey and R. B. Henderson (defendants in six of the Devlin conversion actions) were directors and officers of the American Trust Company and the American Company.

Frank L. Taylor was president of the Pacific American Company, Ltd., and a director of American Company, American Trust Company and the Goldman Sachs Trading Corporation. In the transactions about to be discussed the trial court found that Taylor "acted in said interviews on behalf of the Trading Corporation".

Bradley Brown was the secretary of American Trust Company and of American Company.

C. J. Bertheau was president of Pacific Trust Company, and a vice-president of American Trust Company. At the time of the transaction here in dispute Bertheau was a resident of New York.

Herman Phleger was and is a San Francisco attorney and a partner in the legal firm that represented the American Trust Company and the American Company.

Donald Lamont was and is a San Francisco attorney, and a member of the law firm that represented in San Francisco the Trading Corporation.

Sullivan and Cromwell were a firm of attorneys in New York City, and represented the Trading Corporation there.

With this brief introduction to the cast of characters, we turn now to a *résumé* of the facts involved in these actions; they are not substantially in dispute. As here recounted, the facts have been taken largely from the findings in the Robbins and Archer rescission actions, substantially identical findings having been made in the other actions, but they are not here set forth in the same order as they appear in the findings. In the present recital an attempt has been made to recount the facts, as far as possible, chronologically.

John S. Drum had been connected with the American Trust Company, or its predecessors, for many years. In 1927 he became president of that company. In that same year he became president of the American Company upon its organization. He resigned from both positions June 7, 1929, and went to New York. Late in June of 1929, in New York, Drum, on his own behalf and on behalf of the members of his family, exchanged with the Trading Corporation approximately 7,000 shares of stock of the American Company for shares of the Trading Corporation. In that exchange the American Company stock was valued at $145 per share and the Trading Corporation stock was valued at $102 per share.

Late in June or early in July of 1929 the Drum exchange came to the knowledge of John D. McKee, C. O. G. Miller, Milton H. Esberg, Fred T. Elsey, Alexander Hamilton and Robert B. Henderson. These men were stockholders of the American Company, directors of both that company and of the American Trust Company, and some of them were officers in either or both companies. They owned or controlled about

25,000 shares of American Company stock. These men decided to try to secure from the Trading Corporation an exchange of their stock on substantially the same terms secured by Drum. Accordingly, in San Francisco, they had several interviews with Frank L. Taylor ''who acted in said interviews on behalf of said Trading Corporation, and through him solicited from the said Trading Corporation an offer to exchange stock in the said Goldman Sachs Trading Corporation for the stock of American Company, and discussion was had between them and said Frank L. Taylor as to the basis of the exchange''. In the Archer case (S. F. No. 15,617) it is also found that these negotiations were on behalf of all the stockholders. The actual evidence on this point in the transcript indicates that at the commencement of their negotiations McKee and his associates were mainly interested in their own stock, but that it soon developed that the Trading Corporation was not interested in any exchange unless it could acquire at least the majority of the outstanding stock of the American Company. Thereafter McKee and his associates became interested in securing such an exchange. It is found in all the cases (and the finding is amply supported) that these interviews between Taylor and McKee and his associates ''were without the knowledge of or any precedent authority from'' the various plaintiffs—in fact, the record shows that the stockholders of the American Company, as a group, including the plaintiffs, knew nothing of these preliminary negotiations.

The first tangible result of these interviews between Taylor and McKee and his associates, came in the form of a document delivered by Taylor to McKee in San Francisco. This instrument had been prepared by Attorney Donald Lamont at the request of Taylor. Referred to in the transcript as the ''Lamont form'', it was a proposed form of deposit addressed to the American Trust Company, and intended by Taylor to be used by those stockholders of the American Company who desired to enter into the exchange with the Trading Corporation. It provided that the proposed exchange would only be effectual in the event 51 per cent of the then outstanding stock of the American Company was deposited by August 1, 1929 (or August 15, 1929, if the Trading Corporation elected at its option to extend the period); that the proposed exchange was to be on the basis of seven shares of American

Company stock for nine shares of Trading Corporation stock; that fractional shares could be issued by the Trading Corporation, or, at its election, could be paid for in cash on the basis of $105 per share for Trading Corporation stock (thus evaluating American Company stock at $135 per share). By this document the Trading Corporation was not bound, but the depositing American Company stockholders would have been bound. Thus the Trading Corporation, had the document been executed, would have had what was in legal effect an option.

This proposal was not satisfactory to McKee and his associates; they wanted a binding offer from the Trading Corporation. On July 17, 1929, Taylor left San Francisco for the state of Washington. On July 19, 1929, James K. Lochead, vice-president of the American Trust Company and of American Company, at the request of McKee, telegraphed to Taylor at Bellingham, Washington, as follows: "Lamont out of town until Monday in meantime can you send wire to John D. McKee Chairman Board which will be firm commitment on part Trading Corporation to effect exchange in event fifty-one percent stock is deposited. Committee feels we should have firm proposition before Board Directors makes official recommendation to stockholders for exchange. From conversation with one or two large holders today probably be no difficulty in securing necessary amount. James K. Lochead."

On the same day Taylor replied by night letter as follows: "John D. McKee, Chairman of Board of Directors American Trust Co. and American Co.—San Francisco, Calif. You may consider exchange of nine shares of G S C (Goldman Sachs Trading Corporation) for seven shares of A R C (American Company) as binding upon the Trading Corporation in the event the amount of stock deposited exceeds fifty one per cent of total amount of American Company stock outstanding. I have this authority from the Trading Corporation. Frank L. Taylor."

Upon the receipt of this night letter McKee and his associates met with Herman Phleger, attorney, in San Francisco, to discuss its contents. McKee and Phleger, at the request of the others present, then telegraphed to Taylor, who, they thought, was then in Seattle, Washington, as follows: "Your telegram nineteenth received Saturday (Stop) Owing to absence from City on Saturday of most of my associates had

conference with them this morning (Stop) Elsey Esberg Hamilton Henderson Miller myself agree to exchange in accordance with the offer your said wire and will use best efforts with other stockholders (Stop) As we contemplate sending circular statement to stockholders we think it advisable to have a written or telegraphic offer from Trading Corporation which we suggest be substantially as follows Quote To the Black (American) Company and its stockholders In consideration of the sum of ten dollars paid to the undersigned receipt of which is hereby acknowledged the undersigned hereby irrevocably agrees to exchange nine shares of its present capital stock for each seven shares of the present capital stock of Black (American) Company deposited with Black (American) Trust Company for the purpose of such exchange provided that if a majority of the outstanding shares of Black (American) Company are not deposited for such exchange on or before August 20, 1929, then the undersigned at its option shall be relieved from its obligation; said exchange to be made as of August 31, 1929, Blue (Goldman Sachs Trading) Corporation Unquote Am glad to learn from Lochead that the associates stock will be deposited for exchange if necessary. John D. McKee, Chairman of the Board.''

Immediately after sending that telegram and on the same date, and knowing of the need for haste, and knowing that the Trading Corporation was not interested in an exchange unless 51 per cent of the American Company stock could be secured, McKee and his associates took steps to ascertain the desires of the stockholders of American Company. McKee requested Phleger, attorney for both the American Company and American Trust Company, to prepare a document to be circulated among the stockholders of American Company. This document is referred to as the ''Round robin'', and was in part as follows:

''San Francisco, July 22, 1929. The undersigned stockholders of American Company (each holding the number of shares set opposite his name) irrevocably agree among themselves and with The Goldman Sachs Trading Corporation that if substantially the attached offer shall be made by The Goldman Sachs Trading Corporation within ten (10) days from date that the undersigned will deposit their said

stock with American Trust Company for the purpose of said exchange on or before August 20, 1929.

"Name No. of Shares"

(There then followed a copy of the suggested offer quoted *supra* in the telegram from McKee to Taylor.)

The round robin, at McKee's orders, was circulated among the stockholders of the American Company by the officers and employees of the American Trust Company. This was the first time that the stockholders of American Company, generally, had any knowledge of the proposed exchange. McKee testified that the purpose of the round robin was to acquaint the stockholders with the expected offer and to secure their decision in advance in the interest of time. The circularization took place between July 22 and July 30, 1929, and by that time considerably over 50 per cent of the stockholders had signed it. Included within this number were many of the plaintiffs in these actions. The round robin was not presented to the Trading Corporation for execution, it never having been intended that that company should execute it.

In the meantime, after sending the telegram of July 22d, McKee learned that Taylor, from whom no reply had been received, had left Seattle for Victoria, British Columbia. On July 25, 1929, McKee sent to Taylor at Victoria another telegram substantially similar to the telegram of July 22d above quoted. McKee received no immediate answer from Taylor to either telegram. On July 31, 1929, McKee received from Taylor in San Francisco the original of a telegram to Taylor from the Trading Corporation. This telegram was as follows:

"New York, July 31, 1929. Frank L. Taylor, Hunter Dulin and Co. Hunter Dulin Bldg. You are authorized on our behalf to make the following offer to the stockholders of the American Company Quote The undersigned agrees to exchange nine shares of its capital stock for each seven shares of the present outstanding capital stock of American Company deposited with American Trust Company with transfer stamps attached for purpose of such exchange under terms of Deposit Agreement now on file with American Trust Company subject to the following: One if majority of outstanding stock not deposited by August fifteenth we may with draw and no stock be deposited after that date without our consent Two

we have until September fourteenth to deliver our stock in exchange Three undersigned to receive all dividends declared hereafter on deposited American stock to stockholders of record prior to exchange and depositors shall have same right with respect to our stock deliverable to them Unquote The Goldman Sachs Trading Corp.''

The reference in the above telegram to the ''Deposit Agreement now on file with American Trust Company'' was to the deposit agreement prepared by Lamont, above referred to. McKee was not satisfied with the telegram of July 31, 1929— it was a mere authorization to Taylor and McKee wanted a direct offer. He thereupon prepared a form of letter to be signed by Taylor, and had it delivered to him. This document was dated in San Francisco, July 31, 1929, and is as follows:

''To the Stockholders of American Company: I have received today from Goldman Sachs Trading Corporation a telegram reading as follows: (here Taylor set forth an exact copy of the July 31st telegram to him from the Trading Corporation) . . . Pursuant to the authority contained in the above telegram, and on behalf of the Goldman Sachs Trading Corporation, I hereby make to the stockholders of American Company the offer contained in the said telegram. Frank L. Taylor.''

After receiving this last quoted document from Taylor, McKee drafted a letter and caused the same to be sent to all the stockholders of record of the American Company, including all of the plaintiffs, and including the Trading Corporation, that company owning some American Company stock. These circular letters were dated August 1, 1929, and were prepared in and sent from San Francisco, written on the letterhead of the American Company, and read as follows:

''To the Stockholders of American Company: The Goldman Sachs Trading Corporation has offered to exchange shares of its capital stock for shares of stock of American Company upon terms substantially as follows: 1. The ratio of exchange will be nine shares of capital stock of The Goldman Sachs Trading Corporation for seven shares of American Company. 2. No fractional shares of The Goldman Sachs Trading Corporation will be issued, but American Company stockholders will receive settlement for fractional

shares thereof in cash at the rate of $105 for a full share. 3. The offer is open to all American Company stock that may be deposited for exchange with American Trust Company, 464 California Street, San Francisco, by August 15, 1929. Stock cannot be deposited subsequently without the consent of The Goldman Sachs Trading Corporation. Stock for deposit must be accompanied by the enclosed Assignment and Authorization forms filled out and executed. 4. Unless a majority of the outstanding shares of American Company shall have been deposited for exchange by August 15, 1929, The Goldman Sachs Trading Corporation may at its option withdraw the offer. 5. The exchange of stock will take place not later than September 14, 1929; certificates for capital stock of The Goldman Sachs Trading Corporation will be delivered as soon thereafter as practicable. The holders of a large number of shares of American Company, including all the members of the Board of Directors and the officers of the Company, believe that the proposed exchange will be beneficial to the stockholders, and have signified their acceptance of this offer as to their own stock. Since the offer expires August 15, 1929, prompt action is necessary. Stock should be sent immediately to American Trust Company, 464 California Street, San Francisco, or any of its branches, accompanied by the enclosed Assignment and Authorization forms properly filled out and executed. Yours very truly, John D. McKee, Chairman of the Board.''

Inclosed with this letter were two other documents. One was a form of stock assignment, worded in the present tense, whereby the stockholder ''sells, assigns and transfers unto The Goldman Sachs Trading Corporation'' the designated number of shares owned and deposited by the stockholder, and ''irrevocably'' appoints the ''Secretary or an Assistant Secretary of said American Company Attorney to transfer the said stock on the books of said American Company''. The second inclosed document was entitled ''Authorization to Exchange''. The balance of this document reads as follows:

''..........1929 American Trust Company, 464 California Street, San Francisco, California. Gentlemen: I herewith deposit with you certificates for stock of American Company described below, to be held by you subject to the terms of the offer of exchange made by The Goldman Sachs Trading Corporation, as expressed in the letter addressed

to the stockholders of American Company dated August 1, 1929, signed by John D. McKee, Chairman of the Board. I agree irrevocably that the stock represented by such certificates may be exchanged for the stock of The Goldman Sachs Trading Corporation subject to all the terms of said offer. I authorize you to affix the revenue stamps necessary for the transfer of the enclosed certificates of stock of American Company, and agree to reimburse you for the cost thereof. Certificate Number.....for.....Shares Certificate Number .....for.....Shares Certificate Number.....for.....Shares Total....Shares.

............Stockholder's Signature............Address''

As already stated, the great majority of the stockholders of the American Company, including most of the plaintiffs, were residents of California, and so, of course, in due course of post, received the circular letter, with its inclosures, in California. The trial court found that this letter was ''written and mailed without the knowledge or precedent authority'' of the plaintiffs.

Before continuing with this factual recital, certain comments are here called for. In the first place, plaintiffs never saw the telegram of July 31st. All they saw or knew about was the round robin and the letter of August 1st, with its inclosures. In the second place, McKee had, as the trial court found, no precedent authority to act for the stockholders in sending the letter of August 1st. Appellants strenuously contend that McKee, in transmitting the offer, was the agent of the Trading Corporation. The trial court found that he was not, and in our opinion such finding, whether it be considered a finding of fact or a conclusion of law, correctly fixes McKee's status. From the very first negotiations McKee and his associates occupied a position adverse to that of the Trading Corporation. McKee and his associates admittedly got nothing out of the deal later consummated that every other stockholder who desired it did not get, and on exactly the same terms. Obviously McKee's interests were tied up with those of the other stockholders of American Company. While it is true, as a legal proposition, that McKee as president and chairman of the board of directors of American Company, owed no legal duty towards and had no legal relation to the stockholders in respect of their individual holdings of stock (*Ryder* v. *Bamberger*, 172 Cal. 791 [158

Pac. 753]; *McCord* v. *Martin,* 47 Cal. App. 717 [191 Pac. 89]; *Bacon* v. *Soule,* 19 Cal. App. 428 [126 Pac. 384]) and therefore owed them no duty to disclose the offer to them, it is also true that McKee as president of the American Company and as chairman of its board of directors, took it upon himself as one of the offerees to communicate the offer to those similarly situated. In doing this he was in no sense acting as the agent of the Trading Corporation.

Appellants also contend that the American Trust Company was the agent of the Trading Corporation, or at least an escrow holder. These contentions will be discussed more fully later in this opinion, but at the present time it should be mentioned that appellants' contention in this regard is partially predicated upon the fact that the first time that the correspondence mentions the American Trust Company, and the first suggestion that that company should act for the depositing stockholders is to be found in the deposit agreement prepared by Lamont, which suggestion was carried into the July 31st and August 1st documents. Based upon this fact, the appellants contend that since the attorney for the Trading Corporation first suggested the American Trust Company as depositary, that company must have been the agent of the Trading Corporation. In this connection the trial court found that "the suggestion that the American Trust Company should so act was prompted by the fact that it was natural to expect that the stockholders of the American Company would wish it so to act inasmuch as in effect the stockholders of that company owned the American Trust Company. In no other sense did the Trading Corporation designate the American Trust Company as a depositary or the depositary of any of the stock of American Company, and the only action taken by American Trust Company with respect to the stock of American Company was as agent of the depositing stockholders . . . ''.

The above finding correctly states the facts. The American Trust Company, the principal defendant in these cases, for all practical purposes was owned by the American Company, and that company was owned by its stockholders. The August 1st offer was sent by McKee to considerably over 8,000 stockholders. Obviously, some agency had to act as a depositary for the certificates, and some agency had to represent this large group in carrying out the details of the exchange.

Inasmuch as the vast majority of the offerees were resident in California, and since the American Trust Company had branches throughout the state, it was quite natural that the Trading Corporation should assume, and therefore suggest, that the stockholders would desire the Trust Company to act as their agent in the matter. The suggestion was in accord with common sense and practical business practice.

Immediately after August 1st various stockholders of the American Company brought or sent their stock to the American Trust Company. By August 13, 1929, over 50 per cent of the 649,292 outstanding shares had been deposited for exchange. It should be here added that the Trading Corporation later extended the time for deposit, and as to some other stockholders even after the expiration of the extension the Trading Corporation exchanged on the basis of the above offer. By September 30, 1929, over 523,000 shares and over 18,000 certificates had been deposited for exchange. This involved deposits by some 8,386 stockholders, only 235 of whom were non-residents of California. In the present 173 actions there are involved 45,994 shares of American Company stock deposited for exchange by the plaintiffs.

As each stockholder deposited his stock with the American Trust Company he likewise delivered to that company, fully executed, the stock assignment and the authorization to exchange above quoted. Upon the deposit he received from the American Trust Company, a document entitled "Deposit Receipt", by the terms of which the American Trust Company acknowledged the receipt of a designated number of shares of American Company stock from the named depositor. The balance of this document reads as follows: " . . . and agrees to hold said certificates and to exchange the same for certificates of stock of The Goldman Sachs Trading Corporation pursuant to the offer of said corporation as expressed in the letter addressed to the Stockholders of American Company dated August 1, 1929, signed by John D. McKee, Chairman of the Board. A copy of said letter appears upon the back hereof. If on or before August 15, 1929, there have not been deposited with the Depositary, certificates representing, in the aggregate, a majority of the outstanding shares of American Company then this escrow may be terminated at the option of The Goldman Sachs Trading Corporation and its offer withdrawn, whereupon the shares represented hereby

will be delivered to the Depositor upon presentation of this receipt. The deposit of said certificates and the acceptance of this receipt by the Depositor constitutes the irrevocable agreement of the Depositor to the exchange of the shares deposited hereunder upon all the terms and conditions herein recited, and the agreement of the Depositor to pay the stamp taxes and any other charges incident thereto.'' On the back of the deposit receipt was printed an exact copy of McKee's letter of August 1, 1929.

Immediately after the certificates began to be deposited with the American Trust Company, the officers of that company began to give thought to the details of the exchange, that is, as to the method to be used. During the week of August 4, 1929, Phleger had several conferences with McKee in reference to this matter. During the course of these conversations Phleger warned McKee that if the stock of the Trading Corporation was issued in such a manner as to constitute a sale in California, within the meaning of the Corporate Securities Act, the stock so issued and sold would be void unless a permit from the corporation commissioner was secured. He also pointed out to McKee that if the Trading Corporation forwarded its certificates to the American Trust Company in San Francisco in such a way as to constitute the trust company its agent for delivery, it might be claimed that this constituted a sale in California in violation of the Corporate Securities Act. McKee told Phleger that he had always assumed and had in contemplation that the exchange would take place in New York and not in California. He asked Phleger to write him a letter in line with these conversations. Under these circumstances Phleger, on August 9, 1929, wrote to McKee in the latter's capacity as chairman of the board of directors of American Company as follows:

''Dear Mr. McKee: In connection with the proposed exchange of stock of American Company for stock of The Goldman Sachs Trading Corporation, we wish to call your attention to the fact that if the stock of The Goldman Sachs Trading Corporation to be received by the stockholders of American Company is issued in such manner that a 'sale' thereof, within the meaning of the Corporate Securities Act, takes place in California, the stock so issued will not be valid unless a permit to issue the same is secured from the Commissioner of Corporations of California. If the certificates

representing the stock of The Goldman Sachs Trading Corporation are forwarded to American Trust Company, in San Francisco, with instructions to deliver them to the stockholders of American Company, such delivery of the certificates by American Trust Company might be held to constitute a sale thereof in California by The Goldman Sachs Trading Corporation through its agent American Trust Company. We therefore suggest that the certificates representing the stock of The Goldman Sachs Trading Corporation be delivered by that corporation in New York to Pacific Trust Company, as agent of the stockholders of American Company. The certificates may be mailed by Pacific Trust Company to the stockholders of American Company. If this procedure is followed, it is our opinion that no 'sale' of the stock within the meaning of the Corporate Securities Act will take place in California, and therefore it will not be necessary for The Goldman Sachs Trading Corporation to secure a permit to issue the stock from the Commissioner of Corporations of California. Very truly yours, Brobeck, Phleger & Harrison, by Herman Phleger.'' McKee delivered this letter to Maddux, trust officer of the American Trust Company who was handling the transaction.

Appellants rely on the letter as indicating that at the time the offer was made the original plan was to have a California delivery of the Trading Corporation certificates, and that the New York delivery (later described) constituted a complete change of plan to ''evade'' or to ''avoid'' the California Corporate Securities Act. In this connection the trial court found: ''From the initiation of the transaction referred to herein, McKee assumed that the transaction would be performed and completed in New York and there was no change of plan consequent upon the conversation between Phleger and McKee preceding August 9, 1929, or consequent upon the said letter from Phleger to McKee dated August 9, 1929.''

This finding is supported by the testimony of both McKee and Phleger. The construction sought to be placed on this letter by appellants is not warranted. The transaction under discussion was one of large proportions, involving many millions of dollars. When the letter is read in connection with its factual background it is obvious that Phleger was simply seeking to avoid any future attack on the transaction. There is nothing in the letter to suggest that Phleger ever contem-

plated that it ever had been intended that the Trading Corporation certificates should be issued or delivered in California; he had been told that such was not the fact. Obviously, out of an abundance of caution, he was simply seeking to protect the transaction from the appearance of a California delivery.

After the American Company shares began to be deposited, McKee kept Taylor and the Trading Corporation informed of the number of certificates turned in. On August 14, 1929, McKee informed Taylor, by letter, that a majority of the outstanding stock had been deposited. On August 19, 1929, McKee again wrote to Taylor at his office in San Francisco. In this letter McKee quoted the Phleger letter in its entirety and concluded: ''I understand from Mr. Phleger that there may be some question as to whether or not the delivery of the stock of the Trading Corporation constitutes a sale thereof; but it would seem desirable to avoid this issue, which might be a serious one, particularly as it can be arranged otherwise easily. The stock of American Company deposited can be transferred into one or more certificates in the name of The Goldman Sachs Trading Corporation, and sent to Pacific Trust Company, New York, for exchange either in New York or other States, such as New Jersey, as may be desired . . . ''

McKee at this time, according to this letter, was contemplating adopting the Phleger plan, outlined in his letter, of using the Pacific Trust Company in New York as the medium through which the exchange was to be consummated in New York. Phleger had in fact prepared a form to be sent to the Pacific Trust Company to be used in connection with this plan. It will be noticed that this plan called for the Pacific Trust Company mailing the Trading Corporation certificates directly to the American Company stockholders. McKee objected to this phase of the plan because of the outstanding deposit receipts issued by the American Trust Company. McKee asked Phleger if it would affect the transaction to have the Pacific Trust Company, instead of mailing the certificates directly to the American Company stockholders, mail the Trading Corporation certificates to the American Trust Company, and have the latter company distribute them to the stockholders, and at this time cancel the deposit'receipts. Under date of September 3, 1929, Mr. Phleger wrote to Mr.

McKee in his capacity as president of the American Trust Company, as follows:

"Dear Mr. McKee: Pursuant to our telephone conversation, I write to advise you that in our opinion it is immaterial whether the certificates for stock of The Goldman Sachs Trading Corporation, issued to the stockholders of American Company in exchange for their shares of stock in American Company, and delivered by The Goldman Sachs Trading Corporation in New York to Pacific Trust Company as agent of American Trust Company, are mailed directly to the former stockholders of American Company by Pacific Trust Company or are sent to American Trust Company in San Francisco by Pacific Trust Company, and distributed by American Trust Company here to the former stockholders of American Company. In our opinion whichever method is more convenient to you and to the stockholders of American Company can be adopted without affecting the attainment of the objects set forth in our letter of August 9, 1929. Very truly yours, Herman Phleger."

Also, under date of September 3, 1929, Maddux wrote to the Trading Corporation in New York, informing that company of Phleger's plan, and inclosing a copy of Phleger's September 3d letter and of the proposed letter of instructions addressed to the Pacific Trust Company.

In the meantime the Trading Corporation was somewhat perturbed over the fact that if the American Company certificates deposited for exchange were delivered in New York, this would require the sending of over 17,000 certificates from San Francisco to New York. On September 5, 1929, a meeting was held in San Francisco at which McKee, Phleger and Lamont were present. At that meeting Lamont stated that the Trading Corporation would prefer to have the American Company certificates delivered to some local agent of the Trading Corporation in San Francisco to obviate the necessity of transmitting the deposited certificates (which he estimated at 17,000; actual number was 18,087) to and from New York. Phleger stated he would not consent to the delivery of the American Company certificates in San Francisco. He insisted that they be delivered in New York. Lamont informed McKee and Phleger that he had talked the matter over with a deputy in the state corporation department and had been informed that the certificates could be delivered legally in

San Francisco without a permit. Phleger stated that nevertheless he insisted on a New York delivery. Lamont was then informed that his fears as to the transmittal of the certificates were unfounded—that it was not intended that the thousands of deposited certificates should be transported across the country; that the plan was to send to New York a small number of unexecuted certificates made out in the name of the Trading Corporation covering the number of shares deposited; that these incomplete certificates were then to be executed by the American Trust Company's officers in New York, and delivered to the Trading Corporation there; that then the deposited certificates were to be cancelled in San Francisco. This removed all of Lamont's objections, and he stated he would wire the New York attorneys for the Trading Corporation, Sullivan and Cromwell, the details of the plan. During this conference it was suggested that since C. J. Bertheau was a vice-president of the American Trust Company and was a resident of New York, he could not only deliver the American Company certificates but could also accept delivery of the Trading Corporation certificates, and that therefore the Pacific Trust Company need not be involved at all. After this conference and on September 5, 1929, Lamont wired Sullivan and Cromwell informing them of the result of the conference and generally outlining to them the details of the plan.

On September 6, 1929, McKee wrote to Taylor in San Francisco setting forth full details of the plan. After informing Taylor that 509,995 shares of American Company stock had been deposited with American Trust Company prior to August 15th, and 4,615 shares deposited subsequent thereto, and after informing him that the American Trust Company contemplated partially executing thirty-one certificates evidencing these shares, the letter continued as follows:

"These certificates will be signed by the writer as President, and will be taken to New York by Mr. Bradley B. Brown, Secretary of our company, leaving Saturday night. When Mr. Brown arrives in New York he will in cooperation with Mr. C. J. Bertheau, ascertain if all of the details of the transaction are satisfactory. He then will advise us by telephone or wire, and we will cancel all of the certificates against which the said new certificates are to be issued. Mr. Brown then will complete the new certificates by signing the same as

Secretary and affixing the Corporate Seal. Mr. Bertheau as Vice President of American Trust Company, then will sign the certificates as Registrar, after checking with the Registry Officer in San Francisco for clearance. Completed certificates then will be handed to Mr. Bertheau, as our representative or agent, to be exchanged for stock of The Goldman Sachs Trading Corporation. The latter stock, upon receipt, will be delivered to Pacific Trust Company to be forwarded to American Trust Company, San Francisco. Mr. Brown will carry with him a detailed letter of instructions addressed to Mr. Bertheau, for his guidance. Very truly yours, American Company, J D M (J D McKee) Chairman of the Board.''

The plan as thus outlined was carried out, except in one detail later mentioned. On September 7, 1929, thirty-nine certificates for stock of the American Company, totaling 514,610 shares were made out in the name of the Trading Corporation and signed by the president and transfer agent of the American Company, but not signed by the secretary or registrar of that company. These thirty-nine incomplete certificates were then delivered on that date in San Francisco to Bradley Brown, secretary of the American Trust Company and of American Company, with instructions to deliver the same to Bertheau in New York. There was also delivered to Brown for delivery to Bertheau a letter from McKee. So far as pertinent here that letter stated:

''These certificates have not as yet been signed by Mr. Brown as the Secretary of American Company nor has the corporate seal of that company been affixed. Furthermore, these certificates have not as yet been signed by anyone upon behalf of American Trust Company as Registrar. In accordance with later telephonic authorization and direction from us (that is, either John D. McKee, Parker S. Maddux or James K. Lochead), you are to have Mr. Bradley B. Brown as such Secretary, sign and affix the corporate seal to such of these certificates as we may indicate in such direction, and you are further authorized and instructed to register said certificates so signed by Mr. Brown, by signing your name to such certificates as Vice President of American Trust Company. Over the face of the balance of these certificates, if any, you are to write the word 'cancelled'. When this has been done you are directed to deliver the certificates which have not been marked 'cancelled' to The Goldman Sachs

Trading Corporation in exchange for certificates of The Goldman Sachs Trading Corporation issued in the names of the respective stockholders of American Company, shown on the lists of said stockholders heretofore furnished you and for the respective number of shares thereon indicated, and upon receipt by you from The Goldman Sachs Trading Corporation of checks payable to the respective stockholders of American Company for the sums shown on said lists of stockholders. In delivering the foregoing certificates of American Company to The Goldman Sachs Trading Corporation and in receiving stock certificates of The Goldman Sachs Trading Corporation and checks in return, you will be acting as Vice President of American Trust Company,—American Trust Company in turn acting as the agent of the stockholders of American Company, shown on said lists. You are to receipt for the stock of The Goldman Sachs Trading Corporation and for the above mentioned checks in the capacity indicated. You are hereby expressly authorized to take any and all other steps that may be necessary to complete such exchange in the City of New York. This exchange must be entirely completed not later than September 14, 1929. At the time of the exchange above mentioned you are to exhibit to The Goldman Sachs Trading Corporation the certificates, if any, which have been marked 'cancelled' so that that corporation may be apprised that these certificates, if any, have not been otherwise used. Upon receipt of such certificates for stock of The Goldman Sachs Trading Corporation issued in the names of the respective stockholders of American Company, and said checks payable to the respective stockholders of American Company, you are authorized and directed to deliver said certificates and checks to Pacific Trust Company, 51 Broadway, New York City, with instructions to forward the same to us at San Francisco. Very truly yours, American Trust Company John D. McKee Chairman of the Board.''

Brown arrived in New York on September 11, 1929, and delivered the various documents to Bertheau. On September 10th the American Trust Company had forwarded to Brown two additional incomplete certificates representing some 1558 shares deposited for exchange after Brown's departure.

Upon his arrival in New York Brown discovered that if the American Company certificates were delivered to the Trading Corporation in the state of New York they would be subject

to a New York state transfer tax. He immediately telegraphed McKee informing him of this fact, and stating among other things: "Can avoid however by accepting delivery Trading Corporation stock here but going to New Jersey to deliver American Company stock." He asked for instructions and informed McKee that the "stage all set for exchange" and that the plan was to consummate the exchange on the morning of September 13, 1929. McKee immediately telegraphed to Bertheau: "You are authorized to consummate exchange . . . either in New Jersey or New York as appears best to you."

In the meantime, on September 12, 1929, the American Trust Company cancelled the 18,000 plus certificates deposited with it for exchange and subsequently these cancelled certificates were delivered to the American Company. These facts were telegraphed to Bertheau.

On September 13, 1929, the physical exchange took place. Brown and Bertheau completed the execution of the American Company certificates in their possession and physically delivered them to the Trading Corporation in Jersey City, New Jersey. In New York, Bertheau, on behalf of the American Trust Company, accepted delivery from the Trading Corporation of 660,303 shares of Trading Corporation stock and $350,865 in checks for fractional shares, both made out in the names of the stockholders of American Company, who had deposited their stock for exchange. Brown, in New Jersey, on behalf of the American Trust Company, received a receipt for the certificates delivered by him, and Bertheau, in New York, gave a receipt for the certificates and checks received by him. After the exchange had been consummated and pending the arrival of the checks and the Trading Corporation certificates in San Francisco, on September 17, 1929, McKee sent the following letter to the depositing stockholders:

"To the Holders of Deposit Receipts for Stock of American Company: The exchange of stock of American Company for stock of The Goldman Sachs Trading Corporation in accordance with the plan of exchange set forth in the letter to the stockholders of American Company dated August 1, 1929, has been completed as of September 13, 1929, and our officers in New York have received for the account of the stockholders of American Company who deposited their stock for exchange, certificates evidencing the number of shares of stock of The

Goldman Sachs Trading Corporation to which such stockholders are entitled under the plan of exchange, and checks for the sums payable on account of any fractional shares to which such stockholders otherwise would be entitled. Substantially all of the stock of American Company was deposited for exchange. The certificates for stock of The Goldman Sachs Trading Corporation and the checks in payment for fractional shares are being forwarded to us by mail and we expect to be in a position to make delivery to the depositors on October 3, 1929, upon the surrender to American Trust Company of the deposit receipts issued to the depositing stockholders, and upon payment to American Trust Company of the sum of one cent (1c) per share of stock of American Company so deposited, to cover the cost of revenue stamps and other expenses incidental to the exchange. A stock dividend has been declared by The Goldman Sachs Trading Corporation at the rate of one and one-half shares per one hundred shares, (with cash settlement for fractions), payable October 1, 1929, to stockholders of record September 13, 1929, including those who are entitled to receive stock exchanged as stated above. Yours very truly, American Trust Company, John D. McKee Chairman of the Board.'' Note particularly that by this letter the depositing stockholders were fully informed that the exchange had been consummated in New York.

On and after October 3, 1929, the depositing stockholders presented their deposit receipts to the American Trust Company in California, and upon signing a receipt they received the Trading Corporation certificates and checks for fractional shares to which they were entitled. After the Trading Corporation stock materially depreciated in value, these actions were instituted.

This constitutes the entire factual background of these cases. It is this transaction that plaintiffs challenge in the 173 actions, and the seven appeals, here involved. Although the form of the actions brought by the various groups of appellants differs, they all proceed on the theory that the exchange was invalid, and the Trading Corporation shares received by them were void and valueless for the reason that the Trading Corporation did not secure a permit from the California corporation commissioner. As already stated, the issuing corporation (the Trading Corporation) is defendant

in only two of the 173 actions. All of the appellants, however, seek to hold the American Trust Company liable. The basic contention upon which appellants seek to impose liability on this defendant seems to be that this company is supposed to have violated its duty to the depositing stockholders in accepting these void certificates and is therefore liable in damages to these stockholders for the value of their American Company stock.

A discussion of the law applicable to these cases naturally divides itself into two main parts. First, what was the contract between these parties; where was it entered into; where was it performable; where did title pass to the Trading Corporation stock? Once these points are determined, then, secondly, did the contract so construed violate the terms of the Corporate Securities Act? The first problem is largely one of construction; the second mainly a question of the law. Involved within both of these problems is the question as to whether the American Trust Company was the agent of the depositing stockholders and, if so, whether it acted in the course and scope of its agency in consummating the exchange as it did.

The voluminous briefs of counsel discuss all phases of the above legal problems (and many other more or less related points) in great detail; in fact, counsel have gone far afield in seeking arguments and authorities to support or refute one or the other of the above points. We have no intention of taking up each contention found in the briefs. Giving due consideration to every argument raised by appellants, we are convinced that the transaction as above outlined did not result in appellants' receiving void stock.

Appellants strenuously argue that a contract of sale was entered into in California; that the contract became complete in California; that the Trading Corporation made its offer in California which was accepted by the deposit of the certificates in California; that upon the deposit the stockholders of American Company parted with all control of their stock; that title passed in California; that the contract was performable in California; that the deposit of the American Company stock constituted the acceptance of an offer of a unilateral contract, subject only to the condition that a majority of the outstanding stock be deposited by August 15, 1929.

The lengthy discussion in the briefs as to whether the contract of exchange was entered into in California, or New York (or New Jersey) seems to us to be beside the point. Even if it be assumed that a contract was entered into in California (a conclusion subject to some doubt for reasons later appearing), that would not necessarily be decisive. As we view the problem, the real question is as to the nature and interpretation of that contract; that is, was it an executed or an executory contract? Did legal or equitable title to the Trading Corporation stock pass on August 13, 1929, when a majority of the American Company stock was deposited with the American Trust Company? Did title pass on that date regardless of the lack of delivery of the certificates? Was the contract performable in New York or in California? These are the questions which seem to us decisive of this part of the case.

Our conclusions on this phase of the case are as follows: At most the transaction in California amounted to an executory contract to buy and sell the Trading Corporation stock; in so far as the Trading Corporation is concerned, this contract was performable in New York; title to the Trading Corporation stock passed in New York.

Before setting forth the reasoning supporting these conclusions some reference should be made to the legal nature of an exchange. In law, an exchange is two sales. At the time of the transaction here involved, the Civil Code provided: Section 1804: ''Exchange is a contract by which the parties mutually give, or agree to give, one thing for another, neither thing, or both things, being money only.'' Section 1806: ''The provisions of the title on sale apply to exchanges. Each party has the rights and obligations of a seller as to the thing which he gives, and of a buyer as to that which he takes.''·

Without consideration at present of any question of agency, or power of the American Trust Company, the only sale (as one of the two sales constituting the exchange) we are here interested in, is the sale of the Trading Corporation stock. The American Company stock was outstanding under a valid California permit, and was owned by individuals or corporations. As the law existed at the time of this transaction, the Corporate Securities Act did not apply to persons or corporations selling privately owned stock of which they

were not the issuer or underwriter, at least where such owner was not in the business of selling such stock (*Pollak* v. *Staunton*, 210 Cal. 656 [293 Pac. 26] ; *People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089] ).

■ It is appellants' theory (stated in different ways) that under the terms of the offer as accepted, the Trading Corporation certificates were deliverable in California; that after acceptance there was a change of plan to avoid or evade the Corporate Securities Act; that even if the certificates were deliverable in New York title to the shares of stock in the Trading Corporation (legally or equitably) passed upon the deposit in California.

As to both the question of place of performance and place of passage of title we are dealing with a question of intention of the parties. After a careful consideration of the various documents we are convinced that, to say the least, they are susceptible of the interpretation that they called for a New York delivery of the Trading Corporation certificates, and that they indicate that the parties intended title to pass only upon such delivery.

■ As to the place of performance, the documents are entirely silent. Under such circumstances, we must rely on presumptions based upon the general experience and practice in such transactions. Section 1754 of the Civil Code as it read in 1929 provided: "Personal property sold is deliverable at the place where it is at the time of the sale or agreement to sell, or if it is not then in existence, it is deliverable at the place where it is produced." In *Mattingly* v. *Roach,* 84 Cal. 207 [23 Pac. 1117], this section was held applicable to a sale of stock. In that case defendant was the administrator of Blythe, who resided in San Francisco. Blythe agreed with Mattingly to pay him a commission if the latter found a purchaser for certain stock. Mattingly went to London, found a purchaser, and notified Blythe. Blythe refused to make the sale. One of the points involved was whether the stock was deliverable in San Francisco. On this point the court stated: "The code provides that personal property is deliverable at the place where it is at the time of the sale or agreement to sell, unless the seller has agreed to deliver it elsewhere, or an option as to the place of delivery is provided for. (Civ. Code, secs. 1754 et seq.) The stock of the Blue Jacket Mining

Company was personal property, and was in San Francisco at all the times named in the complaint. Blythe never agreed to send the stock to Mattingly, or gave him any option as to the place of delivery. It was therefore to be delivered and paid for in San Francisco, and the instructions upon that subject were proper.'' See, also, *Russell* v. *Ruffcorn,* 132 Cal. App. 215, 231 [22 Pac. (2d) 597, 23 Pac. (2d) 1014], where it was also held that section 1754 of the Civil Code was applicable to the sale of stock.

The rule embodied in old section 1754 of the Civil Code is the rule of the common law (*Gray* v. *Walton,* 107 N. Y. 254 [14 N. E. 191]) and is also the rule under the Uniform Sales Act, adopted in this state in 1931—see section 1763, Civil Code. (See, also, 2 Williston on Sales, 2d ed., pp. 1117, 1118; *Gruen* v. *George A. Ohl & Co.,* 81 N. J. L. 626 [80 Atl. 547].)

An interesting application of these principles to the sale of stock is to be found in *Neer* v. *Lang,* 252 Fed. 575. This was an action to recover damages for the breach of an alleged contract to sell shares of stock. The case turned upon whether a contract to sell had been made. As here, the correspondence, so far as the offeror was concerned was silent as to the place of performance. The offeror of the shares in Fort Leavenworth, Kansas, telegraphed his offer to sell to the offeree in Detroit. Nothing was said in the offer as to place of delivery. The offeree sent a purported acceptance in which he stated in part, ''ship with draft attached, and wire when you have done this''. Thus, by the purported acceptance, the buyer tried to provide that the stock was deliverable at Detroit. The court held that the law *implied* the stock was deliverable at the residence of the seller, that the buyer thus sought to inject a *new item* into the offer and therefore his purported acceptance was invalid. The court stated at page 577: ''Every trade or business has its usages, and persons who make offers relating thereto assume that all the customary incidents of such callings shall be part of the agreement, and they do not need to be expressly stated in the written or oral offer, as the law implies them. The law implies that the place of delivery of the stock shall be at the place of the seller, nothing appearing to the contrary; that is to say, in this case the place of delivery under the offer as made was Ft. Leavenworth, Kan. But under the acceptance delivery

was to be made at Detroit, Mich., where plaintiff resided . . . there was no contract.''

Appellants cite many cases, of which *Burr* v. *Western States Life Ins. Co.*, 211 Cal. 568 [296 Pac. 273], *Ivey* v. *Kern County Land Co.*, 115 Cal. 196 [46 Pac. 926], *Tuller* v. *Arnold*, 93 Cal. 166 [28 Pac. 863], and *Hammond* v. *Ocean Shore Dev. Co.*, 22 Cal. App. 167 [133 Pac. 978], are typical, which deal mainly with the question of venue and which hold generally that unless a contract provides to the contrary it is presumed to be performable where it is made, or where part performance is to be had. This is, of course, a well settled rule of law, but those cases do not modify the statutory and common law rule that personal property is normally deliverable at the place where it is located at the time the contract of sale or to sell is entered into. ▮ In the instant cases the trial court found, and the finding is amply supported, that at all times prior to September 13, 1929, the Trading Corporation shares were located and had their situs in New York; that New York was the natural place for the delivery of such stock; and that New York had a natural relation to the transaction. This last mentioned finding is of importance. New York was not unrelated to the transaction; the least that can be said is that New York had a normal and reasonable connection with the transaction. New York was not seized upon as a subterfuge to evade the law of California; it was, to say the least, one of the states where delivery reasonably could be made. This has always been considered an important factor by the courts in passing on the validity of contracts (*Seeman* v. *Phila. Warehouse Co.*, 274 U. S. 403 [47 Sup. Ct. 627, 71 L. Ed. 1123]).

▮ Aside from these considerations, there is another rule of law applicable to these facts which leads to the same conclusion. It must be assumed, of course, that the parties hereto intended to enter into a legal and binding contract. Neither of the contracting parties was deliberately intending to mislead or defraud the other. The trial court found that at the time of the transaction, and for a considerable time thereafter, none of the plaintiffs gave any thought or consideration to the existence or nonexistence of a permit; in other words, they intended and hoped by this transaction to enter into a valid contract of exchange. If the contract be construed as providing for a California delivery, and passage of title, it

would be invalid, but if construed as providing for a New York delivery, and passage of title, as will later appear, it is valid. Certainly the New York delivery construction is equally reasonable with the California delivery construction. Under such circumstances, the courts are bound to give the contract "such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties" (Civ. Code. sec. 1643; see, also, Civ. Code, sec. 3541). The California courts have applied this rule of construction to a variety of situations. Supported by many authorities, the rule is stated as follows in 6 California Jurisprudence, page 268, section 168: "As between two permissible constructions, that which establishes a valid contract is preferred to that which does not, since it is reasonable to suppose that the parties meant something by their agreement, and were not engaged in an attempt to do a vain and meaningless thing. The parties are deemed to have intended a lawful, rather than an unlawful, act, and their agreement is to be construed, if possible, as intending something for which they had the power to contract. All intendments being against fraud and in favor of fair dealing, it will not be presumed against a writing that it contemplated a violation of the law, unless that conclusion becomes irresistible from the very reading of the instrument." This rule is not limited to California, but is one of general application. (*Gilbert* v. *Fosston Mfg. Co.*, 174 Minn. 68 [216 N. W. 778, 218 N. W. 451]; *Brierley* v. *Commercial Credit Co.*, 43 Fed. (2d) 724, *certiorari* denied 282 U. S. 897 [51 Sup. Ct. 182, 75 L. Ed. 790].)

It is no answer to point out, as do appellants, the strong public policy behind the Corporate Securities Act. That statute is undoubtedly a salutary law. The same can be said of the usury law, the statutes restricting corporation action, and the many other statutes to which the rule of construction here being discussed has been applied. This rule of interpretation must be applied by the courts, unless a contrary construction is compelled by the terms of the contract. It is peculiarly applicable in the present case where the plaintiffs, and the other stockholders, got exactly what they wanted and what they bargained for—where no fraud or imposition has been proved—and where they are now trying to recoup their

losses, by a strained and technical construction of the contract, from what turned out to be a bad bargain.

In our opinion, not only did the contract, reasonably construed, call for a New York delivery of the certificates, but it also evidences an intent that title to the Trading Corporation stock was to pass at the time and upon the delivery of those certificates. In the first place, if we apply to the contract the same presumptions and same rules of construction discussed in reference to delivery of the certificates, this conclusion is inescapable. To have title to the Trading Corporation stock pass in California would be to so interpret the contract as to render it violative of the Corporate Securities Act; to hold that title passed in New York is to so interpret the contract as to render it valid. Under such circumstances, even if the contract were silent on the point, we would be compelled, under the rules discussed above, to uphold the contract.

 The question as to when title passes is, of course, primarily one of intention. The documents here involved, reasonably interpreted, indicate an intention to have title pass upon delivery of the certificates, and not upon the deposit of the American Company stock. In his letter of August 1, 1929, McKee informed the stockholders that the offer was "to exchange shares" for "shares"; that the "offer is open to all American Company stock that may be deposited for exchange with American Trust Company . . . by August 15, 1929"; that "the exchange of stock will take place not later than September 14, 1929; certificates for capital stock of The Goldman Sachs Trading Corporation will be delivered as soon thereafter as practicable". The authorization to exchange, addressed to American Trust Company, was just what the words express, an authority *to exchange*. It stated in part: "I agree irrevocably that the stock represented by such certificates *may be exchange*d for stock of The Goldman Sachs Trading Corporation subject to all terms of said offer." The deposit receipt acknowledges receipt of the deposited certificates, and the American Trust Company "agrees to hold said certificates and to exchange the same for certificates of stock of The Goldman Sachs Trading Corporation". Other references could be made to somewhat similar language contained in the round robin, the Lamont form, the offer of July

31, 1929, and in other documents. It is certainly true that the quoted language does not indicate an intent of the parties that title to the American Company shares should pass immediately and *ipso facto* upon the deposit of the certificates. Although ambiguous, such language can reasonably be interpreted to mean the parties intended title to pass only upon the mutual exchange of the certificates.

That the language should be so construed is also indicated by the fact, frequently noted in the cases, that to business men certificates and the shares represented thereby are inseparable. ▮▮▮▮ It is, of course, true, as urged by appellants, that in all cases physical delivery of the certificates is not necessary to effectuate the transfer of title to shares of stock. (*Hughes Mfg. Co.* v. *Elliott,* 178 Cal. 181 [172 Pac. 584]; *Provident G. Min. Co.* v. *Manhattan Securities Co.,* 168 Cal. 304 [142 Pac. 884]; *Young* v. *New Pedrara Onyx Co.,* 48 Cal. App. 1 [192 Pac. 55]; *Cuthill* v. *Peabody,* 19 Cal. App. 304 [125 Pac. 926].) These cases correctly hold that certificates are only the evidence of ownership of shares of stock, and that shares may be issued, held, and dealt with under some circumstances without certificates. Cases so holding are collected in great numbers and commented upon by appellants at length. It hardly needs citation of authority to state that under some circumstances title to shares of stock may pass without delivery of the certificates. On the other hand respondents cite many cases, and discuss them at equal length, holding that certificates are a species of property and not mere evidence of ownership. These cases are of little help in the present actions. What we are here considering is not what could have been done, but what these parties, as reasonable men and women, intended to do. The authorities are numerous to the effect that the usual and ordinary course of business is that a contract for the sale of shares is executed by the indorsement and delivery of the certificates (6A Cal. Jur., p. 657, sec. 367). So widespread is the custom of treating certificates as property and passing title to stock by the delivery and indorsement of the certificate, that the United States Supreme Court in *National Safe-Deposit Sav. & Tr. Co.* v. *Hibbs,* 229 U. S. 391, 395 [33 Sup. Ct. 818, 57 L. Ed. 1241], stated: "These principles are well known to business men and are constantly acted upon by them. This circum-

stance should be given due weight in determining the rights of the parties in this case."

Various courts have emphasized that the business man's view is that ownership of the certificate is necessarily coupled with ownership of the shares (*Cummings* v. *Clark*, 282 Fed. 300; *Powers* v. *Pacific Diesel Engine Co.*, 206 Cal. 334 [274 Pac. 512, 73 A. L. R. 1398]; *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325 [7 Am. Rep. 341]). Due weight, in construing a contract between business men must be given to the business man's view (*National City Bank of Chicago* v. *Wagner*, 216 Fed. 473; see, also, *DeGanay* v. *Lederer*, 250 U. S. 376 [39 Sup. Ct. 524, 63 L. Ed. 1042]). In the absence of an expressed intent to the contrary we must construe this transaction as one intended by the parties to be consummated in the usual and ordinary manner; that is, title to pass upon delivery of the certificates.

So far the discussion has proceeded on the theory that an executory contract to buy and sell the Trading Corporation shares was entered into in California. This is to interpret the transaction most favorably to appellants. Respondents contend that no contract was entered into until September 13, 1929, when the physical exchange took place. This contention is based upon the fact that the Trading Corporation's offer as transmitted to Taylor on July 31, 1929, and by him transmitted to McKee, was materially changed by the latter when he communicated it or transmitted it to the American Company stockholders. ██ It is elementary that an acceptance is required to be identical with the offer, and must be unconditional and not add any new terms thereto. If the terms of the offer are changed or added to by the acceptance, there is no meeting of the minds and no contract.

██ The stockholders of American Company saw and acted upon McKee's letter of August 1st; prior to September 13, 1929, none of them saw the Trading Corporation's telegram to Taylor of July 31, 1929. A reference to the July 31st telegram and the August 1st letter will indicate the material variations. The offer of July 31st states that the exchange was to be made in accordance with the "terms of Deposit Agreement now on file with the American Trust Company"— the so-called Lamont form. By that agreement the Trading Corporation reserved to itself the option to issue fractional shares, or to pay for them in cash. McKee's letter of August

1st states that "No fractional shares . . . will be issued, but American Company stockholders will receive settlement for fractional shares thereof in cash". This was a material variance—the actual cash paid by the Trading Corporation for fractional shares amounted to over $350,000. There are other variations of a more or less material nature.

Based on these facts, and the further fact that the trial court found that McKee in transmitting the offer was not the agent of the Trading Corporation, (and as already held, that finding is amply supported) respondents contend that the minds of the parties did not meet at the time of deposit, and that no contract was in fact entered into until September 13, 1929. The correctness of this contention need not now be passed upon, for the reason that it is our opinion that even if a contract to sell was entered into in California, and even assuming such contract was illegal as being in violation of the Corporate Securities Act, such illegality did not affect the validity of the Trading Corporation stock, issued and delivered in New York—a state where such issuance and delivery were admittedly legal. At most, interpreting the transaction most favorably to appellants, we have a situation where a foreign corporation makes, in California, an offer to sell its stock, delivery and passage of title to take place in a state reasonably connected with the transaction—New York; this offer we will assume was accepted in California. The validity of the stock when so issued, in our opinion, was not affected even if the prior contract to sell it was illegal.

As already indicated, even if it be assumed that the Corporate Securities Act did apply to the negotiations had in this state, and even if it be assumed that the executory contract, so far as the seller—the Trading Corporation—is concerned, was illegal, nevertheless, the performance and execution of the contract in New York, being legal there, and being complete in themselves, stand independently of the prior illegality.

 Before discussing this conclusion it should be pointed out that we are here interested only in the acts of the Trading Corporation, the prospective seller of its stock, and are not interested in the acts of the prospective buyers. In spite of the general language found in some of the cases that stock issued in violation of the Corporate Securities Act is "void", it is well settled that that act belongs to that type of statute

which is aimed at one class for the protection of another class. In other words, the prohibitions and penalties of the Corporate Securities Act are levelled against the seller and not against the buyer. This is well settled (*Domestic & Foreign Pet. Co., Ltd.,* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73] ;*Western Oil etc. Co.* v. *Venago Oil Corp.,* 218 Cal. 733, 744 [24 Pac. (2d) 971, 88 A. L. R. 1271] ; *National Bank* v. *J. G. Ruddle Properties, Inc.,* 218 Cal. 435 |23 Pac. (2d) 1016] ; *Braunstein* v. *Title Guarantee & Trust Co.,* 216 Cal. 780 [17 Pac. (2d) 104] ; *Eberhard* v. *Pacific Southwest L. & M. Corp.,* 215 Cal. 226 [9 Pac. (2d) 302] ). We have already pointed out that an exchange constitutes two sales, and that the sale of the American Company shares is not questioned. It therefore follows that the only activities that can be questioned under the Corporate Securities Act are the activities of the Trading Corporation.

We now turn to a discussion of our conclusion that, assuming the activities of the Trading Corporation in California violated the Corporate Securities Act, nevertheless the subsequent performance in New York was legal, and the shares issued there were valid in all respects. This conclusion is predicated on the point already discussed that the contract called for the issuance of the Trading Corporation shares in New York, the contract was performable there, and title passed there. ▉▉▉ Contracts which are illegal only because of the place or time of their making may be later adopted at places or times when or where they are not unlawful. Appellants' argument would visit upon the Trading Corporation a species of judicial outlawry ; it would lead to the conclusion that whenever a foreign corporation desired to sell some of its stock to California residents, and, in California, through one of its representatives, entered into negotiations looking toward such object, assuming such negotiations to be illegal, it never could legally complete the deal, either in this state after it secured a permit, or elsewhere without one. The preliminary illegal transactions would, under this theory, so far affect the transaction, that it never could free itself from the taint of illegality. Such is not the law. If the offer of July 31 or August 1, 1929, was illegal, and if the other activities of the Trading Corporation in California were illegal, in fact, even if the executory contract to sell was illegal, that would not prevent the parties from later making another legal

contract in New York dealing with the same subject matter. The authorities are quite uniform in holding that the mere act of performing in accordance with the terms of the original offer or executory contract may amount, in itself, to a lawful contract. Stated another way, it does not impair the validity of a sale when made that the prior contract to make it was illegal. This is so because the sale or executed contract may legally stand on its own feet, independent of the prior executory contract.

These principles are well settled. An excellent illustration of the applicability of these principles to the sale of stock is found in *Bauer* v. *Bond & Goodwin, Inc.*, 285 Mass. 117 [188 N. E. 708]. The so-called blue sky law of Massachusetts prohibited ''an agreement whereby a person transfers or agrees to transfer an interest in securities'' or ''an attempt to sell, an option of sale, a solicitation of a sale, a subscription or an offer to sell'' ''unless or until'' a notice of intention to sell was first filed with the department of public utilities. Violations of the act were made public offenses. In a prior case, *Kneeland* v. *Emerton*, 280 Mass. 371 [183 N. E. 155, 87 A. L. R. 1], the Supreme Judicial Court of Massachusetts had held that an innocent purchaser who had purchased his shares from a seller who had not filed his notice could rescind the purchase. The Bauer case was predicated on the rule of the Kneeland case. The facts were that the defendant solicited the sale, and received from the prospective buyer an offer to buy on February 6, 1928, before the required notice was filed. The statutory notice was filed February 8, 1928, and subsequently the contract was executed. Upon discovering the facts the purchaser brought an action to rescind. The court stated the problem involved as follows (p. 709): ''We have, therefore, a case of a contract of sale and an actual sale wholly in conformity to law, unless they are invalidated by the fact that the preliminary transactions were unlawful.''

In holding that the prior admittedly illegal negotiations did not affect the validity of the subsequently executed sale, the court reasoned as follows: ''Where a contract or a sale grows out of illegal conduct, its affirmative validity depends upon its completeness as a source of rights apart from illegal conduct participated in by the party who seeks to enforce it

against the other. *Hall* v. *Corcoran,* 107 Mass. 251, 253 [9 Am. Rep. 30]; *Cranson* v. *Goss,* 107 Mass. 439, 441 [9 Am. Rep. 45]; *Stewart* v. *Thayer,* 170 Mass. 560 [49 N. E. 1020]; *Horn* v. *Dorchester Mutual Fire Ins. Co.,* 199 Mass. 534 [85 N. E. 853]; *Pelosi* v. *Bugbee,* 217 Mass. 579 [105 N. E. 222]; *Higgins* v. *Fitzgerald,* 266 Mass. 176 [164 N. E. 812]; *McMullen* v. *Hoffman,* 174 U. S. 639 [19 Sup. Ct. 839, 43 L. Ed. 1117]. Many of the decided cases arose under the statute forbidding 'labor, business or work' on the Lord's day. G. L. (Ter. Ed.) c. 136, sec. 5. Such cases do not furnish a perfect analogy in all respects. Under that statute the parties commonly are *in pari delicto,* and are equally within its prohibition; executed transactions stand and executory contracts are invalid, because neither party can obtain affirmative relief. *Myers* v. *Meinrath,* 101 Mass. 366 [3 Am. Rep. 368]; *Clapp* v. *Hale,* 112 Mass. 368 [17 Am. Rep. 111]; *Gordon* v. *Levine,* 197 Mass. 263 [83 N. E. 861, 15 L. R. A. (N. S.) 243, 125 Am. St. Rep. 361]; *Horn* v. *Dorchester Mutual Life Ins. Co.,* 199 Mass. 534 [85 N. E. 853]. Under the statute here involved, the parties are not *in pari delicto,* and a buyer who does not participate in wrongdoing may rescind even a completely executed purchase in which the seller violated the statute. *Kneeland* v. *Emerton,* 280 Mass. 371 [183 N. E. 155, 87 A. L. R. 1]. But the two statutes have features in common. In both, the prohibition, as applied to a sale, is not limited to a transfer of title but extends as well to an executory contract to sell and to other preliminary steps. *Pattee* v. *Greely,* 13 Metc. 284; *Bennett* v. *Brooks,* 9 Allen, 118, 120; *Tuckerman* v. *Hinkley,* 9 Allen, 452, 454; *Bradley* v. *Rea,* 14 Allen, 20; Id., 103 Mass. 188 [4 Am. Rep. 524]; *Kryzminski* v. *Callahan,* 213 Mass. 207 [100 N. E. 335, 43 L. R. A. (N. S.) 140]. We need not consider whether the contract made on February 9th by the acceptance of the plaintiff's offer of February 6th was tainted by the illegal conduct of the defendant's salesman. Compare *Tuckerman* v. *Hinkley,* 9 Allen, 452; *Dickinson* v. *Richmond,* 97 Mass. 45; *Gibbs & Sterrett Manuf. Co.* v. *Brucker,* 111 U. S. 597 [4 Sup. Ct. 572, 28 L. Ed. 534]. We pass to the actual sale. The payment of the consideration and the transfer of the shares both took place after the defendant was free to sell. Those acts fixed completely the rights of the parties, without reliance upon the executory contract or any earlier

transaction. For that reason, the actual sale was not tainted by the earlier illegal conduct of the defendant.''

The point here under discussion is exhaustively discussed in accordance with the views herein expressed in 3 Williston on Contracts, secs. 1707, 1758. See, also, *Brocalsa Chemical Co.* v. *Langsenkamp*, 32 Fed. (2d) 725, and *Los Angeles Fisheries Inc.* v. *Crook*, (1931) 47 Fed. (2d) 1031, where the rule was applied in cases somewhat similar to the facts involved in the instant appeals.

We are not without authority in this state on the same point. In *Waring* v. *Pitcher*, 135 Cal. App. 493 [27 Pac. (2d) 397], the defendant subscribed and paid for shares of stock before a permit was secured. The stock was delivered to the purchaser after a permit had been obtained. The purchaser accepted the stock and acted as a stockholder for a period of time. This action was brought to enforce the old statutory stockholders' liability. Appellant contended that she never was a stockholder because of the violation of the Corporate Securities Act. It was conceded that the subscription and payment ''prior to the issuance of a permit were void and could not be validated by ratification or estoppel''. The court held, however, that the execution of the illegal contract, after it had become legal, constituted a new and independent contract as of the time of performance. The court stated: ''Under the authorities it appears entirely clear that prior to the time of receiving and accepting the certificate appellant could have demanded the return of her money. Respondent contends, however, that as the corporation was in existence when the certificate was delivered to plaintiff and held a valid permit to issue stock at that time, appellant's act of accepting and retaining the certificate had the same legal effect as a new and independent contract for the sale of the stock as of the time of such delivery. Respondent's contention finds ample support in *Moore* v. *Moffatt*, 188 Cal. 1 [204 Pac. 220], and must be sustained. Appellant was therefore a stockholder and subject to the provisions of the law then in force relating to stockholders' liability.''

*Moore* v. *Moffatt*, 188 Cal. 1 [204 Pac. 220], cited in the Pitcher case, *supra*, is a leading case. There an agreement for a stock subscription was entered into at a time when the corporation had no permit. The stock was issued and accepted after a permit was obtained. This action was brought

by the trustee of the issuing corporation, it having become bankrupt, to recover the difference between the sums paid by the purchasers and the par value of the stock. The defense was that the contract to subscribe was illegal and therefore defendants were not stockholders. The court held: "Conceding, for the purposes of discussion and decision, as is contended in support of the judgment, that the subscription agreement was in its inception void and incapable of acceptance by the corporation because executed, in contravention of the provisions of the Investment Company's Act (Stats. 1912, p. 715), prior to the procurement of a permit from the corporation commissioner authorizing a sale of the corporation's stock, and therefore could not have been legally made the basis of an action against the defendants upon the theory that they were stockholders in the corporation, still we have the admitted fact in the plaintiff's case that no stock of the corporation was in fact issued in response to any agreement of the parties until after an admittedly regular and valid permit had been granted by the corporation commissioner. This being so, the subscription agreement, even though it may have been void and incapable of acceptance in the first instance, should, in the light of the subsequent conduct of the parties to the transaction, be considered and construed as a continuing offer to subscribe for the stock in question, pending the procurement of a permit from the corporation commissioner, which ultimately became the embodiment and expression of a new agreement to purchase the stock entered into at a time when the only legal obstacle in the way of a valid agreement had been overcome. The agreement, so considered, and having been in fact ultimately accepted by the corporation after the required permit had been procured—as evidenced by the issue of the stock upon the order of the defendants—the validity of its making and acceptance must be measured and tested by its character as revealed by the circumstances and conduct of the parties with relation thereto at the time of its ultimate acceptance rather than by the circumstances attending its mere physical making in the first instance. That is to say, the conduct of the parties to the transaction, the defendants on the one hand and the corporation on the other, with reference to the subject matter of the agreement, at a time when the only legal obstacle to the making of a valid subscription agreement had been overcome

by compliance with the statutory requirement, was tantamount to an adoption by them of the terms and conditions of the subscription agreement as of the date of its ultimate acceptance, thereby in effect making it finally effectual as the expression of a new agreement, even tho in its original making it may have been void and ineffectual for any purpose. Of course, the parties to the transaction could not, nor did they, as a matter of law, by their adoption of the agreement ratify and thereby validate as of the time of its original making or any time thereafter an agreement which may have been void in the first instance. But the parties could, and we think they did, when the bar of the statute to the making and acceptance of a valid agreement had been removed, elect to adopt and accept and stand upon the subscription agreement already signed as embodying—even tho it may have been ineffectual at the time it was signed—the terms and conditions of a new agreement by which their future dealings were to be governed.''

The Moffatt case has been frequently cited and on occasion distinguished. The cases distinguishing it, however, are not cases where there was an independently sufficient transaction after the transaction became legal.

The doctrine of the cases referred to and quoted from *supra* is not based on the ratification of a prior illegal contract, or upon estoppel, but upon the rule that the validity of a sale when made is not affected by a prior illegal contract to make such sale. The sale, itself, stands independently of the prior illegal contract to make it.

The application of these principles to the present appeals would be quite obvious had the stockholders of American Company, after having received the offer from the Trading Corporation (which offer is assumed to have been illegal) gone to New York themselves and accepted delivery of the Trading Corporation certificates, instead of doing so by agent. Then, obviously, the New York transaction would stand independently of the prior negotiations in California. The stockholders of American Company, however, did not go personally to New York but did so through their agent, the American Trust Company. In the closing brief of appellants it is strenuously urged that, admitting the correctness of the principles above discussed, they are not applicable here for the reason that the New York transaction is not severable from the

California negotiations. The appellants state their contention as follows: ''There is an insurmountable difficulty to the application of the doctrine defendants urge. In the cases relied upon, the *parties themselves* participated in the latter transaction at a time and place where it was legal and that transaction had all the elements of legal completeness. *That is not true in this case. The parties themselves did not participate in any dealings in New York.* The parties to the dealings in New York were the Trading Corporation on one side and American Trust Company on the other side. *Those dealings can be attributed to the depositors only by showing that American Trust Company was their agent. To show that agency, it is necessary to show the prior illegal dealings in California.''* This argument is not sound. As already pointed out, so far as the Trading Corporation stock was concerned, the American Company stockholders, including the plaintiffs, were buyers. Also, as already pointed out, the prohibitions of the Corporate Securities Act are aimed at sellers and not buyers. Stated another way, the actions of the buyers in California were not illegal. Since this is so, the appointment of the agent in California by the buyers was legal. No illegal California transaction need be drawn on to give vitality to the New York transaction.

It, therefore, follows that even if it be assumed that the negotiations in California were illegal, nevertheless the validity of the sale in New York was not affected. This conclusion makes it unnecessary to pass upon the contention of respondents, that the Corporate Securities Act, properly interpreted, has no application at all to negotiations had in California that contemplate the issuance and sale of stock in a foreign jurisdiction. Nor, in view of this conclusion, need we discuss the proper interpretation of *Pollak* v. *Staunton,* 210 Cal. 656 [293 Pac. 26], *Hohn* v. *Peters,* 216 Cal. 406 [14 Pac. (2d) 519], and *Gillis* v. *Pan American etc. Co.,* 3 Cal. (2d) 249 [44 Pac. (2d) 311].

 Little more need be said. The authority of the American Trust Company, as agent for the American Company stockholders, was not limited to this state. The findings of the trial court that there was no change in plan, and the further finding (whether it be considered a finding of fact or conclusion of law) that the American Trust Company was the agent of the depositing stockholders and had full authority

to do everything it did, including the authority to go to New York and accept the Trading Corporation's certificates there, are amply supported and legally justified. What the depositing stockholders wanted and what the documents indicate they instructed their agent to get, and what, as held in this opinion, they received, was nine valid Trading Corporation shares for every seven shares of American Company stock deposited by them. In other words, the transaction is simply one where the American Trust Company was appointed by the American Company stockholders to get certain stock for them. The trust company had authority to do all that was necessary or appropriate to bring about this result. This principle is elementary, and is clearly stated in 1 Mechem on Agency, second edition, page 560, section 789, as follows: "As has already been pointed out, every delegation of authority, whether it be general or special, express or implied, unless the contrary be made known, carries with it, as an incident, the power to do all those acts, naturally and ordinarily done in such cases, and which are necessary and proper to be done in the case in hand in order to effectuate the purpose for which the authority in question was created. It embraces all the necessary and appropriate means to accomplish the desired end. This principle is founded on the manifest intention of the party creating such authority and is in furtherance of such intention."

The principle is codified in section 2319 of the Civil Code in the following language: "An agent has authority: 1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency . . . " (See *Stephens* v. *Ahrens,* 179 Cal. 743 [178 Pac. 863]; *Arcade Realty Co.* v. *Bank of Commerce,* 180 Cal. 318 [181 Pac. 66, 12 A. L. R. 102].)

The application of these principles to the present case is obvious. The Trading Corporation certificates were located in New York. That state was reasonably connected with the transaction. If the exchange were consummated in California it would violate the California Corporate Securities Act. The only way valid Trading Corporation stock could be obtained was by entering into a legally sufficient transaction in New York. Obviously, this was within the agent's authority.

If there were any doubt as to whether the agent had authority to consummate the exchange in New York (which, in

our opinion, there is not), the fact that both the agent and the principals construed the agency as including this power, would be of considerable weight. Obviously the agent construed its authority as including the power to go to New York to obtain the stock, by actually going there and obtaining it. The principals were informed by letter from the agent dated September 17 that, "The exchange of stock of American Company for stock of The Goldman Sachs Trading Corporation . . . has been completed as of September 13, 1929, *and our officers in New York have received for the account of the stockholders* of American Company . . . certificates evidencing the number of shares of the stock . . . ", etc. With this information in their hands, informing them that the deal had been consummated in New York, the American Company stockholders, several weeks later, accepted from their agent the Trading Corporation certificates. The effect of such construction by the agent and acquiescence by the principal is well illustrated in *LeRoy* v. *Beard*, 49 U. S. (8 How.) 450 [12 L. Ed. 1151], and *McNeil* v. *Shirley*, 33 Cal. 202.

For the foregoing reasons it is apparent that the judgments appealed from should be and each of them is affirmed.

Seawell, J., Shenk, J., Curtis, J., Langdon, J., Spence, J., *pro tem.*, and Thompson J., concurred.

Rehearing denied.