Filed 1/27/23  Taricco v. Taricco CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MAUREEN TARICCO, | B312303 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. YC071264 |
| DEANE TARICCO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert B. Broadbelt, Judge.  Affirmed.

Dentons US, Robert F. Scoular, David Simonton; Primary Law Group and Joshua Kroot for Plaintiff and Appellant.

Sauer & Wagner, Gerald L. Sauer and Amir A. Torkamani for Defendant and Respondent.

———————————

# SUMMARY

This case presents a dispute over ownership of a family-owned company whose business consists of owning and leasing commercial property. The mother, Deane Taricco (defendant here), was the majority shareholder. Her son, Tari Taricco, was the minority shareholder and president of the company. In a two-sentence "Agreement to Sell Shares" signed in 2008, defendant agreed to sell all her shares to her son, at any time he chose (including after her death), for the sum of $10,000 for each 1 percent of her share ownership. Defendant signed the agreement, but she was in a hurry at the time and did not read it, and her son did not give her a copy of it. In November 2013, the son died in an accident.

His wife Maureen Taricco (the personal representative of the son's estate) sued his mother for specific performance of the 2008 agreement. After a 14-day court trial, the court found Maureen Taricco (plaintiff) was entitled to specific performance. Among other things, the court found there was consideration for the agreement because it granted the son an option to purchase stock while he was an employee of the company, which provided an incentive to continue his employment.

The court rejected defendant's unclean hands defense, finding nothing prevented her from reading the agreement before she signed it, or from making a copy of it when she signed it. The court also found that, since neither party presented evidence of the value of defendant's shares in 2008, there was no evidence to support defendant's assertion that the option price undervalued her shares of the company.

Defendant sought a new trial, contending, among other things, an error of law: that specific performance "cannot be

2

enforced against a party to a contract" in cases where "he has not received an adequate consideration for the contract" or "[i]f it is not, as to him, just and reasonable." (Civ. Code, § 3391, subds. 1. & 2.) Defendant argued the trial court's failure to make any express findings as to whether plaintiff met her burden of proof on this issue precluded the grant of specific performance. The trial court agreed, and granted a new trial, limited to the issues of whether defendant received adequate consideration and whether the agreement was, as to defendant, just and reasonable.

At the second trial, the court found, based on expert testimony, that the fair market value of defendant's shares in 2008 was more than $5.4 million, while the option price in the 2008 agreement was approximately $530,000. The court concluded plaintiff did not meet her burden of proving defendant received adequate consideration. Further, the court found that, taken together, the gross disparity between the fair market value and the option price, and the circumstances in which defendant signed the 2008 agreement, "establish that the 2008 Agreement is not just and reasonable as to defendant."

On appeal, plaintiff's principal contention is that the trial court was bound by factual and legal findings at the first trial that were not vacated, and "improperly ignored, recast and contradicted those findings" at the second trial. Plaintiff also raises an evidentiary issue and a separate issue about ownership of nine shares that was resolved against her in a summary adjudication. We do not find any contradiction in the trial court's findings in the two trials; nor do we find any error in the court's evidentiary ruling or its summary adjudication. Accordingly, we affirm the judgment.

3

## FACTS

### 1.    The Background

We recite the background facts, for the most part as found in the trial court's statement of decision after the first trial, often quoting without attribution from the trial court's ruling.

The company whose ownership is at issue is Fuel Engineering Corporation (FEC), a nominal defendant.  FEC owns commercial real estate, and its principal activity is leasing its property to several tenants.  Defendant's late husband, Lawrence Taricco, co-founded the company in the 1950's.  In 1976, defendant and her husband acquired all 100 outstanding shares of FEC.  They gave five shares to each of their two sons, Tari and Todd Taricco.

In 1980, defendant became FEC's president; her husband was vice president; and Tari and Todd were secretary and treasurer, respectively.  In 1981, defendant and Tari were responsible for the company's day-to-day business operations. Lawrence Taricco died in July 1981, and defendant was then the owner of their 90 shares.

In 1984, defendant redeemed some of her shares, reducing her ownership from 90 shares to 62.61 shares.  With the sons each having five shares, a total of 72.61 shares were outstanding.

In 1991, defendant sold six shares of FEC to Tari for $168,000 ($28,000 per share).

On May 25, 1992, in preparation for defendant's retirement and Tari assuming sole management of FEC, defendant signed an "Agreement to Sell and Transfer Stock."  Defendant agreed to sell all her shares to Tari for $28,000 per share, if purchased in whole or in part within five years, on or before May 25, 1997. The trial court stated:  "Pursuant to that agreement Tari

4

purchased a certain number of shares of FEC from defendant." (More about the number of shares later.)

Effective December 29, 1992, defendant retired as president of FEC, and Tari became "chief officer"—president, secretary and treasurer—with sole responsibility for FEC's management and operations.

In August 1998, Tari purchased his brother Todd's five shares, for $150,000. Defendant and her son Tari were then the sole shareholders of FEC.

On January 22, 2008, defendant and Tari entered into the "Agreement to Sell Shares" on which this lawsuit is based. The agreement states, in its entirety: "Deane Taricco agrees to sell all shares held in Fuel Engineering Corporation, a California Corporation to Tari Taricco for the sum of $10,000 per each 1% of share ownership of said Corporation held by Deane Taricco. This agreement may be exercised at any time at the election of Tari Taricco and shall be binding upon any will or estate of Deane Taricco."

Tari died in an airplane crash on November 19, 2013. At the time of his death, Tari owned 34 of FEC's outstanding 72.61 shares, or 47 percent, and defendant owned 38.61 shares, or 53 percent.

After Tari's death, plaintiff asked defendant a number of times to honor the stock option in the 2008 agreement, and plaintiff's counsel sent a demand letter to defendant on November 19, 2015. Defendant refused the demand.

Plaintiff filed this lawsuit in April 2016, and her first amended complaint in July 2016. She alleged causes of action for specific performance, fraud, breach of fiduciary duty, declaratory relief, and involuntary dissolution. Defendant answered and

filed a cross-complaint for declaratory relief and money had and received. Defendant's answer included unclean hands as an affirmative defense.

## 2.    The Litigation

Several claims and cross-claims were disposed of before the first trial. Plaintiff alleged a cause of action for specific performance of a May 1992 agreement with Tari to provide "the stock certificate for the 9 shares of stock he purchased from [defendant] in 1992." The trial court granted summary adjudication for defendant on that issue on the ground the claim was time-barred because it accrued when the shares were paid for in 1992. Plaintiff dismissed her causes of action for fraud and involuntary dissolution before trial.

The court also granted summary judgment to plaintiff on defendant's cross-complaint. In her cross-complaint, defendant sought a declaration that she transferred only nine shares of FEC stock to Tari in 1992, and mistakenly double-counted when she recorded their shareholdings and executed a stock certificate for 24 shares (which also included the 1991 sale of six shares). The court found defendant's causes of action were likewise barred by the statute of limitations.

### a.    The first trial

The causes of action at issue in the first trial were for specific performance of the 2008 agreement, two claims for breach of fiduciary duty, and declaratory relief. The court resolved the fiduciary duty claims in favor of defendant, and they are not at issue in plaintiff's appeal.

At the close of the first trial, plaintiff argued defendant had "failed to meet her burden of proving want of consideration"; defendant was bound by the 2008 agreement despite her

6

testimony she did not read it; and defendant's "unclean hands" argument was unfounded. Plaintiff also contended: "Whatever Defendant's 'undervaluation' point may be, it is irrelevant and there is no competent evidence to support it."

Defendant contended, along with points not relevant, that the 2008 agreement was unenforceable due to lack of consideration. Further, specific performance was barred by unclean hands because Tari Taricco "essentially tricked [defendant] into signing a document that could purportedly divest her of the entirety of her ownership of FEC's shares for $530,000," while the value of FEC's assets was, defendant claimed, approximately $23 million. And in previous transactions in 1991 and 1992, Deane sold her shares to Tari for $28,000 and $30,000 per share respectively, far more than the price in the 2008 agreement. "Thus, Tari knowingly and intentionally misled [defendant] into signing a document that severely undervalued her shares of FEC."

In addition to the background facts described earlier, the trial court made the following factual and legal findings.

The trial court began by rejecting defendant's affirmative defense of lack of consideration. The court found defendant did not meet her burden to rebut the presumption under Civil Code section 1614 that a written agreement "is presumptive evidence of a consideration." (§ 1614.) And, the court found the 2008 agreement was supported by consideration because " '[c]onsideration is inherent where stock options are granted to employees and the employee continues employment knowing of the options,' " quoting *Newberger v. Rifkind* (1972) 28 Cal.App.3d 1070, 1073 (*Newberger*). In that connection, the court found:

7

"[D]efendant and Tari had a dual relationship—(1) they had a family relationship as mother and son, and (2) they also had a business relationship as majority shareholder and director in a corporation (defendant) and minority shareholder, director, employee, and President in the corporation (Tari)."

"[A]t the time defendant and Tari entered into the 2008 Agreement, Tari was an employee and President of FEC, defendant expected that Tari would continue his employment at FEC, and defendant expected and wanted Tari to continue to manage and operate FEC."

"In addition, after defendant and Tari entered into the 2008 Agreement, Tari continued his employment in that capacity at FEC for another five years until he died in November 2013. Thus, applying the Court of Appeal's ruling in *Newberger,* the court finds that Tari's continued employment at FEC was consideration that supported the 2008 Agreement. . . . Like the Court of Appeal in *Newberger,* the court finds that the bargain supporting the stock option agreement was implied from the circumstances presented in this case."

After rejecting two other affirmative defenses not at issue here, the court turned to defendant's affirmative defense of unclean hands.

The court found defendant did not meet her burden of proving Tari's conduct in obtaining defendant's signature on the 2008 agreement barred recovery. The court found defendant testified "that she signed the 2008 Agreement without reading it and that she did not discuss its contents with Tari either before signing it or at any other time." The court stated "[t]here was nothing that prevented defendant from reading the one-paragraph 2008 Agreement before she signed it, Tari did not

8

make any representations to defendant about the contents of the agreement to mislead her or to induce her to sign it, and there was nothing preventing defendant from making a copy of it before Tari left her house that morning." The court cited cases holding that parties are bound by contracts even if they do not read them; and that it is generally not reasonable to fail to read a contract.

The court added: "[T]here was no expert testimony or other competent evidence presented to establish the value of defendant's shares in FEC at the time she entered into the 2008 Agreement. Thus, there is no evidence to support defendant's assertion that the option price for defendant's shares set forth in the 2008 Agreement 'undervalued her shares of FEC.'"

After rejecting plaintiff's claims that defendant had breached her fiduciary duties to minority shareholders and to the company in multiple ways, the court found plaintiff was entitled to a declaratory judgment that the 2008 agreement was valid and required defendant to sell all her shares to plaintiff as personal representative of Tari's estate.

b.     **The second trial**

As described at the outset, defendant sought and the trial court granted a new trial. The court limited the new trial to two issues: whether defendant received adequate consideration and whether the agreement was, as to defendant, just and reasonable. (See, e.g., *Lucientes v. Bliss* (1958) 157 Cal.App.2d 565, 568 ["It is a well recognized principle of law in this state that in an action for specific performance of a contract a plaintiff must not only allege but must also prove that the contract sought to be specifically enforced is not only just and reasonable but that the consideration is adequate," citing Civ. Code, § 3391].)

9

### i. Whether consideration was adequate

The court first considered whether defendant received adequate consideration for the 2008 agreement. The court concluded plaintiff did not meet her burden of proof on that issue. The court discussed in detail the expert testimony both parties presented. We need not describe that testimony, as plaintiff does not challenge the court's conclusion about the value of defendant's shares. The court's findings were these.

The exercise price for the stock option to purchase all defendant's shares was $531,744.94, about $13,772 per share.

The expert witnesses agreed that defendant's ownership interest in FEC as of January 22, 2008, was worth "millions." (Plaintiff's real estate appraiser valued FEC's real estate at $11.9 million, and defendant's appraiser valued it at $14 million. Plaintiff's business valuation expert opined the fair market value of FEC on January 22, 2008, was $6,765,500, or $93,176 per share. Defendant's expert opined the value was $14,302,200, or $196,972 per share.)

The court found (explaining why in detail) the fair market value of the equity interest in FEC was $10,302,200, and defendant's 38.61 shares were worth $5,478,142. This was 10.3 times greater than the option purchase price, and even under plaintiff's expert's analysis, 6.7 times greater than the option purchase price. The court concluded that under either analysis, there was "a gross disparity between the $531,744 option price for defendant's FEC shares and the fair market value."

The court also found that Tari's continued employment at FEC was an element of the consideration defendant received for the 2008 agreement. However, "plaintiff did not establish that

10

the value of Tari's continued employment to defendant justified the incredible disparity between the option price at which she was compelled to sell her FEC shares under the 2008 Agreement and their fair market value at the time."  Tari's continued employment "had some value to defendant," but "it does not appear that it had so much value to defendant as to justify her agreeing to divest herself of her ownership interest in FEC for 10.3 times (or even 6.7 times) less than it was worth."

The trial court also considered other circumstances relevant to the adequacy of consideration.  (See, e.g., *Berkeley Lawn Bowling Club v. City of Berkeley* (1974) 42 Cal.App.3d 280, 290 [a challenge based on Civ. Code, § 3391 principles "must be considered in view of the entire circumstances [citation], including the object to be obtained by the contract and the relationship of the parties and must be determined as of the time the contract was made"].)

The court addressed plaintiff's contention the object of the agreement was to ensure Tari's continued management of FEC and "to effectuate the intent . . . that Tari would become 100% owner of FEC, keeping the family business in the family."  The court found there was "very little, if any, evidence indicating what the parties' mutual intention was as to the object to be obtained by the 2008 Agreement.  The words of the two-sentence 2008 Agreement do not shed any light on the parties' intention as to the object to be obtained by it other than to give Tari the right, at his election, to purchase defendant's shares of FEC at the stated price."

The court considered testimony from plaintiff that defendant had told her several times that Tari and plaintiff's family " 'will own [FEC]' " and " '[t]his is the legacy for your

11

family,' " and similar statements. But the court found that, "in light of the circumstances under which defendant signed the 2008 Agreement . . . , the fact that these statements were made in various contexts not addressing the 2008 Agreement, and the great disparity between the option price and the fair market value of defendant's shares, these statements do not establish the object to be obtained by the 2008 Agreement or that defendant received adequate consideration for that contract."

The court also considered prior transactions in which defendant transferred shares of her FEC stock to Tari. Defendant and her late husband gave Tari five shares in 1976; in 1991, defendant sold Tari six shares for $168,000 ($28,000 per share); and in 1992, Tari purchased nine shares for $270,000 ($30,000 per share). (Tari also purchased his brother's five shares in 1998 for $30,000 per share.) While Tari owned 34 shares when he died (rather than only the 25 just described), the court "[found] credible defendant's explanation that nine additional shares of her FEC stock were transferred to Tari by mistake when defendant prepared a stock certificate for Tari for 24 shares that was inaccurate because it should have been for 15 shares."

Plaintiff argued these transactions showed defendant historically sold her shares to Tari at below fair market value. But the court found that, "given the substantial length of time between the prior transactions where defendant transferred shares of her stock to Tari (in 1976, 1991, and 1992) and the 2008 agreement, and the lack of competent evidence to show what the fair market value of defendant's shares were at the time of each of the prior transactions" (except for the 1976 gift), "these prior stock transactions . . . have little probative value in determining

12

whether defendant received adequate consideration for the 2008 Agreement. The previous stock transactions . . . are also not probative of the parties' mutual intention as to the object of the 2008 Agreement because . . . at the time defendant signed the 2008 Agreement, she did not know she was signing a contract that would allow plaintiff to buy her stock."

The court specifically found defendant's testimony about the circumstances in which she signed the 2008 agreement to be credible. The court described defendant's testimony. Defendant was getting ready to go golfing. She was in a hurry and was "on her way out the door when Tari appeared unannounced at defendant's home with a paper for her to sign between 8:00 and 9:00 a.m." Tari came in and said, " 'mother I need your signature on this.' " Defendant signed the document but did not read it. "Defendant knew nothing about what was on that paper"; she "did not know that she had agreed to sell all of her shares to Tari for less than fair market value." "Although defendant asked Tari for a copy of the document, Tari never gave her a copy of it." "After defendant signed the document, she never had a discussion with Tari about it." Also, the price per share is not apparent on the face of the document and requires a computation; defendant testified "she was not able to determine the price per share without a calculator."

The court concluded that, "[t]aken together, all of these facts concerning the circumstances in which defendant signed the 2008 Agreement show that the parties did not have a 'mutual intention' to be obtained by the contract other than the objective meaning of the words stated in the contract."

Finally, the court also considered the "dual relationship" of defendant and her son, including expert testimony that it is

13

common for parents to transfer shares in businesses to children at less than fair market value (and other expert testimony that the IRS can impose additional tax and penalties against parents who do so). The court found that neither the mother-son relationship nor the business relationship "made either the exercise price for the stock option . . . or Tari's continued employment at FEC . . . adequate consideration for the contract." Those relationships "might justify a below-market sale of defendant's stock to Tari," but "they do not justify the gross disparity between the fair market value of defendant's shares and the option price which plaintiff seeks to enforce."

### ii. Whether the contract was just and reasonable as to defendant

The court also found the 2008 agreement was not just and reasonable as to defendant. This finding was based on the gross disparity between the fair market value and the option price, and on the circumstances in which defendant signed the agreement. The court stated as follows.

"Defendant is bound by the terms of the agreement even though she did not read it." But, the court explained, "the fact that defendant is bound by the contract does not mean that it may be specifically enforced against her," citing Civil Code section 3391. The court repeated the findings we have described above about the circumstances of the signing. Specifically, "the evidence established" that defendant did not know the contents of the agreement when she signed; she did not know she had agreed to sell her shares for less than fair market value; Tari did not leave a copy with defendant that day and never gave her a copy of it despite her request; and defendant could not determine the price per share without a calculator.

14

The court observed that it had found in the first trial that defendant did not meet her burden of proving Tari's conduct barred recovery based on unclean hands. But "that finding addressed defendant's affirmative defense of unclean hands and did not address Civil Code section 3391's separate rule that specific performance cannot be enforced against a party to a contract if it is not just and reasonable as to that party." Defendant's affirmative defense "focused on *Tari's* and *plaintiff's* conduct," while "section 3391's restriction on specific performance focuses on whether the contract is just and reasonable as to *defendant*." And, there was no evidence presented in the first trial to support defendant's assertion that the option price undervalued her shares in FEC, while there was expert testimony in the second trial to establish the value of her shares in 2008.

On January 20, 2021, the trial court entered its amended judgment in favor of defendant.

Plaintiff filed a timely notice of appeal.

## DISCUSSION

### 1. The Standard of Review

"To be entitled to specific performance of a contract, a plaintiff must plead and prove that the contract is just and reasonable and the consideration adequate, as required by [Civil Code] section 3391." (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110.) "Since that remedy is discretionary [citations], we must consider whether the denial was an abuse of discretion." (*Ibid.*)

Plaintiff does not base her challenge to the judgment on an absence of substantial evidence, instead asserting "fundamental and prejudicial errors of law."

## 2.     The Claim of Contradictory Findings

As mentioned at the outset, plaintiff's principal contention is that the trial court was bound by factual and legal findings at the first trial that were not vacated, and "improperly ignored, recast and contradicted those findings" at the second trial. According to plaintiff, the court's 2019 decision and its 2021 decision "are fundamentally inconsistent" and "cannot legally co-exist."

We have described the trial court's findings at both trials in considerable detail. We find it apparent from a reading of the court's statements of decision that there is no inconsistency or contradiction. There were no findings at the first trial on the points that must be pleaded and proved by plaintiff to obtain specific performance. Plaintiff blames defendant, who asserted, unsuccessfully, defenses of a total absence of consideration and unclean hands. But it was plaintiff's burden to prove adequacy of consideration and that the agreement was just and reasonable as to defendant. Plaintiff failed to do so at either trial.

We have examined plaintiff's claims the trial court "disregarded or misstated key evidence"; "cast aside and contravened" findings at the first trial; "fixate[d] solely on a hypothesized arm's length [fair market value] transaction"; relied "on the improper about-face finding that [defendant] 'did not know she was signing a contract that would allow plaintiff to buy her stock,' " and so on. None of these claims withstands scrutiny.

Preliminarily, we note that plaintiff twice asserts, at the outset of her argument and at its end, that at the first trial defendant "waived and forfeited" the issues that were decided at the second trial. Plaintiff has not stated this point under a separate heading or subheading, as required by court rules

16

(Cal. Rules of Court, rule 8.204(a)(1)(B)); nor has plaintiff supported the point with argument (*ibid.*). She states only that the specific performance issues (adequacy of consideration and justness and reasonableness to defendant) were not in issue at the first trial "[a]s a result of [defendant's] deliberate course of conduct from the outset of the case, and express renunciation." (Plaintiff raised this point below in opposition to defendant's new trial motion, and the court rejected it.) In the absence of any argument explaining the point, we consider it forfeited, and turn to the claims plaintiff has presented.

### a. Defendant's signing of the 2008 agreement

Plaintiff argues that at the first trial, the court "found that [defendant] knowingly signed the 2008 Agreement" and then, "in a startling about-face," found in the second trial that defendant did not know what she was signing. Plaintiff misstates the court's finding at the first trial, adding the word "knowingly." The court made no such finding; the court found that defendant signed the agreement—a point that has never been disputed. It is plaintiff who has "recast" the finding, not the trial court.

Plaintiff also points to the trial court's finding that Tari made no representations to defendant about the contents of the agreement to mislead or induce her to sign it, and to the court's legal conclusion that parties are bound by agreements even if they do not read them. Those findings are not inconsistent either; they are irrelevant to the issues before the court at the second trial. The existence of a contract does not mean that the contract may be specifically enforced; that is an entirely different question, as Civil Code section 3391 tells us.

17

### b. Defendant's knowledge of the contents of the 2008 agreement

Plaintiff insists the evidence "confirms [defendant] knew full well the contents" of the 2008 agreement. Plaintiff then recites evidence of conversations in 2013 and 2014, after Tari's death, which she claims "established <u>without contradiction</u> that [defendant] was fully aware of the contents of the 2008 Agreement." This is wrong, too.

For one thing, that evidence does not establish defendant knew the contents of the agreement when she signed it in 2008. For another, most of these conversations were hotly disputed at the first trial, and plaintiff cites no findings (and there are none) by the trial court indicating it agreed with plaintiff's version of events. For example, plaintiff testified that in a telephone call in November 2013, immediately after Tari's death (and while defendant was on a cruise off the African coast with her granddaughter), plaintiff asked defendant if she would honor the 2008 agreement and defendant said, "my word is my bond." Defendant, however, testified to the contrary: that plaintiff said nothing about a 2008 agreement during that call, and that she had no idea of its existence.

Another example is a tape-recorded December 18, 2014 board meeting. Plaintiff asserts that "[i]n [defendant's] own words on the recording, heard by the court, she acknowledged that her stock 'was supposed to go to originally and always to Tari.' " It was plaintiff, not defendant, who said defendant's stock "was supposed to go to originally and always to Tari." Defendant's response cannot fairly be read as "acknowledg[ing]" plaintiff's statement or as showing knowledge of the 2008

18

agreement; defendant said, during the exchange, "No, my stock was not going to Tari."

In short, at the second trial, the trial court specifically credited defendant's testimony that she "did not know that she had agreed to sell all of her shares to Tari for less than fair market value." The court made no findings in the first trial that undermine its conclusion about the veracity of defendant's testimony. There was no contradiction of previous findings, and therefore no legal error.

Plaintiff further complains that the court decision in the second trial "omits [defendant's] knowledge of the value of FEC's stock prior to entering into the 2008 Agreement." (Plaintiff cites evidence in the second trial of an appraisal in 2006 of FEC's real estate holdings.) We fail to see how defendant's alleged knowledge in 2008 of the value of her stock is relevant to plaintiff's burden to establish the adequacy of consideration and the justness of the 2008 agreement. The point is the court found defendant did not know she had agreed to sell all her shares in the first place, at less than fair market value or otherwise.

c. **The signing circumstances**

Plaintiff next contends the trial court's reliance on defendant's testimony about the circumstances under which she signed the agreement (see pp. 13–14, *ante*) "is foreclosed as a matter of law." According to plaintiff, the court's 2019 ruling "reject[ed] . . . the <u>exact same factual premises</u>" in connection with defendant's unclean hands argument in the first trial. That is plainly not the case.

As should be apparent from our recitation of the trial court's rulings, the trial court did not "cast aside" its findings in the first trial: that is, that Tari "did not make any

19

representations to defendant about the contents of the agreement to mislead her or to induce her to sign it."  Because there were no representations, and because nothing prevented defendant from reading or copying the agreement, and because parties are bound by contracts even if they do not read them, defendant failed to prove her unclean hands defense in the first trial.  But at the second trial, plaintiff had to prove the consideration was adequate and the agreement was just and reasonable as to defendant.  These were different issues, and the trial court's ruling at the second trial did not, as plaintiff asserts, "insinuat[e] some wrongful concealment" or "insinuat[e] that Tari's conduct . . . was somehow misleading and inequitable."  On the contrary, the trial court credited defendant's testimony that she did not read the agreement and did not know what she was signing.  The court made no contradictory findings about Tari's conduct.

### d. The object of the 2008 agreement: the relationship of the parties

As plaintiff points out, the test for adequacy of consideration "is not whether the promisor received the highest price obtainable for his property, but whether the price he received is fair and reasonable under the circumstances," and "in addition to the value of the property to be conveyed, the court may consider such factors as the relationship of the parties, their friendship, love, affection, and regard for each other, and the object to be obtained by the contract."  (*Henderson v. Fisher* (1965) 236 Cal.App.2d 468, 474; see also *O'Hara v. Wattson* (1916) 172 Cal. 525, 528 ["[j]ust how far such matters [as the relations of the parties and the object to be attained by the contract] should incline a court, in its sound discretion, to conclude that a price less than the value as found, is nevertheless

20

adequate to justify specific performance, we cannot state by any general formula of words"].)  Plaintiff contends the trial court disregarded its previous findings about the object of the 2008 agreement and the relationship of the parties.  Again, that is not the case.

Plaintiff tells us the objects of the 2008 agreement were "ensuring Tari's continued management, effectuating that he would become 100% owner of FEC, and keeping the family business . . . in the family."  But the trial court made no findings at the first trial concerning "the object to be obtained by the contract."  Plaintiff cites four findings we have described above (*ante*, at pp. 4–5 & 8), but none of them says anything about the object of the 2008 agreement.  The court merely found that defendant and Tari had a "dual relationship" (family and business); Tari was president of FEC in 2008 and defendant expected and wanted him to continue managing FEC; Tari continued in FEC's employ for five years; and in 1992—more than 15 years earlier—defendant had entered into an agreement, to sell all (or any part) of her stock to Tari for $28,000 a share if he purchased within five years (by 1997).

None of those findings contradicts or is inconsistent with the trial court's finding at the second trial that "there is very little, if any, evidence indicating what the parties' mutual intention was as to the object to be obtained by the 2008 Agreement."  The court specifically considered plaintiff's testimony that defendant told her several times over the years that Tari and his family would own FEC, but concluded in light of the context of those statements and other circumstances that the statements "do not establish the object to be obtained by the 2008 Agreement or that defendant received adequate consideration for

21

that contract." We see no basis to disagree with the trial court's assessment.

### e. The object of the 2008 agreement: historical stock transactions

Plaintiff next contends the trial court "fixates solely on a hypothesized arm's length [fair market value] transaction, not the entire circumstances of these parties," and "contradicts the undisputed critical fact" that the average price of the shares Tari purchased from defendant was $5,793 per share, compared to $13,727 per share in the 2008 agreement. Both of these claims are false.

First, the trial court considered the "entire circumstances" at length (see pp. 10–14, *ante*). In addition to the fair market value of defendant's shares, the court considered the stock option price; Tari's continued employment; the object to be obtained by the agreement; defendant's statements about Tari and his family owning FEC; the prior stock transfers; the circumstances under which defendant signed the agreement; and the relationship between defendant and Tari. Plaintiff's claim to the contrary is not borne out by the record.

Second, the claim that Tari's purchases of defendant's stock averaged $5,793 per share is about as far from an "undisputed critical fact" as one can possibly imagine. The trial court's recitation of Tari's stock acquisitions from defendant was not "plain error," nor was it "inaccurate and incomplete."

The trial court found Tari was given five shares by his parents in 1976, bought six shares from defendant in 1991 for $28,000 a share and nine shares in 1992 for $30,000 a share. The court also found defendant transferred nine other shares by mistake. Plaintiff bases her $5,793 "average price" in part by

22

eliminating the $270,000 Tari paid for nine shares in 1992 (and by ignoring the court's finding that another nine shares were transferred by mistake). Plaintiff eliminates the $270,000 by pointing out that defendant gave Tari the $270,000 he used to purchase those shares. Plaintiff fails to point out that defendant gave $270,000 to each of her sons. Tari chose to use his gift to purchase shares; his brother Todd did not. If anyone has "rejigger[ed] and reconstruct[ed]" the history of the stock transfers, it is plaintiff, not the trial court.

In any event, the court's conclusion that stock transactions in 1991 and 1992 have little probative value in determining either the object of, or the adequacy of consideration for, the 2008 agreement was a reasonable assessment, not "plain error."

### f. Tari's continued employment

Plaintiff next contends the trial court ignored Tari's continued employment as consideration for the 2008 agreement. That, of course, is not so. The court considered that factor (as we describe *ante,* at p. 11), and concluded Tari's continued employment had some value to defendant, but not so much value as to justify an agreement divesting herself of ownership "for 10.3 times . . . less than it was worth."

Plaintiff asserts that defendant's acceptance of consideration in the form of Tari's employment "waived any Section 3391 objection she may have had." For this proposition, plaintiff cites *J.J. Howell & Associates, Inc. v. Antonini* (1954) 124 Cal.App.2d 388, 391 (*J.J. Howell*) (" 'fairness and adequacy of consideration need not be alleged where an agreed upon consideration has been accepted, the acceptance constituting a waiver of any claim of inadequacy' ").

23

*J.J. Howell* has no application here. In that case, the court affirmed an order for specific performance of a contract to convey real property, where the court found the description in the grant deed erroneously omitted a portion of the property agreed to be conveyed. (*J.J. Howell, supra,* 124 Cal.App.2d at pp. 389–390.) One of the defendant seller's contentions was that the plaintiff failed to plead and prove there was adequate consideration and that the contract was just and reasonable as to defendant. (*Id.* at pp. 390–391.) The court observed there was an exception to that rule "where an agreed upon consideration has been accepted." (*Id.* at p. 391.) The evidence showed the plaintiff "paid the purchase price of the property involved" and the complaint had alleged "that plaintiff paid the agreed purchase price for the property." (*Ibid.*) Consequently, there was no merit to the defendant's objection to the sufficiency of the complaint. (*Ibid.*)

The circumstances here, where Tari's employment constituted only part of the consideration—and a part the court found was "implied from the circumstances" under *Newberger, supra,* 28 Cal.App.3d at page 1075—are not remotely analogous. There was no waiver of the section 3391 requirement to prove adequate consideration in order to obtain specific performance.

### g. Plaintiff's evidentiary claim

In connection with her claims about the object of the 2008 agreement and the relationship of the parties, plaintiff argues the trial court erred in excluding testimony about statements made by Tari.

The court sustained defendant's hearsay objection when counsel asked plaintiff what Tari told her about "why he stayed on after the option agreement." The court also sustained defendant's hearsay objection to a question to plaintiff as to what

24

Tari said to her when he acquired shares from defendant in 1992. And, the court granted defendant's motion to strike plaintiff's testimony that "I was told that by Tari, that he was the majority." (This referred to plaintiff's claim that Tari owned nine additional shares of FEC, purportedly giving him a majority interest in FEC.)

Plaintiff contends the excluded testimony is admissible under Evidence Code sections 1261 and 1250. We disagree.

Evidence Code section 1261 states an exception to the hearsay rule: "Evidence of a statement is not made inadmissible by the hearsay rule when offered *in an action upon a claim or demand against the estate of the declarant* if the statement was made upon the personal knowledge of the declarant at a time when the matter had been recently perceived by him and while his recollection was clear." (*Id.*, subd. (a), italics added.)

Since this lawsuit is not an action upon "a claim or demand against the estate of the declarant" (Tari), we see no basis to fault the trial court's ruling. Plaintiff's only argument is a one-sentence assertion that Evidence Code section 1261 allows admission of statements favorable to the estate as well as statements unfavorable to the estate. For this assertion, plaintiff cites *Stewart v. Estate of Bohnert* (1980) 101 Cal.App.3d 978, 989–990. *Stewart*, however, unlike this case, *was* a claim against an estate. (*Id.* at pp. 983–984.) The claim was one for which the estate would be liable "only . . . insofar as [the decedent's] insurance cover[ed] [the plaintiff's] claims." (*Id.* at p. 985.) An exclusion from coverage was at issue. (*Id.* at p. 984.) The trial court admitted in evidence a declaration from the decedent's insurance agent about statements the decedent made to him showing he was aware of the exclusion. (*Id.* at p. 989.) The

25

Court of Appeal ultimately enforced the exclusion. (*Id.* at pp. 989–990.) The court found the decedent's statements were not hearsay (because they were admitted only to establish the statements were made), but even if they were hearsay, the evidence "would be acceptable under section 1261." (*Id.* at p. 990.) We do not see how *Stewart* has any application to this case.

Plaintiff also says the statements are admissible under Evidence Code section 1250, "to the extent it goes to Tari's then-existing mental state or intent," but explains no further and cites no authority to explain how Tari's mental state or intent are relevant.

Plaintiff has the burden on appeal of demonstrating prejudicial error in the trial court's evidentiary rulings. She has demonstrated neither error nor prejudice.

### 3.    The Summary Adjudication Ruling

In her complaint, plaintiff also alleged that in December 1992 Tari purchased an *additional* nine shares of FEC stock for $270,000 ($30,000 per share), pursuant to a written agreement, giving Tari majority ownership of the company. The only written agreement at the time was defendant's May 25, 1992 five-year agreement to sell Tari shares for $28,000 a share. (This nine-share allegation was very much disputed, with defendant contending the $270,000 was payment for the nine shares that were included in Tari's 24-share certificate.)

Plaintiff alleged that Tari purchased the shares but defendant failed to deliver a share certificate. She sought specific performance. She claimed the contract was "executory" and was not breached until she demanded delivery of the share certificate more than 20 years later, in February 2014 after Tari's death.

26

The trial court granted defendant's motion for summary adjudication based on the four-year statute of limitations, finding no merit in plaintiff's claim the contract was "executory by nature." The authorities plaintiff cited, the court said, "do not state a rule that a seller's obligation to provide stock certificates is delayed until someone demands those certificates twenty years after someone pays for them."

On appeal, plaintiff makes the same argument and cites the same authorities. We are not persuaded.

*Robbins v. Pacific Eastern Corp.* (1937) 8 Cal.2d 241 (*Robbins*) involved "an exchange, or purported exchange" of stock in one company for stock in another. Plaintiffs in 173 actions claimed the exchange was void as to them because it violated California securities laws. (*Id.* at p. 246.) The court discussed when title passes, and stated the question was "primarily one of intention." (*Id.* at p. 274.) The documents in that case "indicate[d] an intention to have title pass upon delivery of the certificates, and not upon the deposit of [the stock of one of the companies]." (*Ibid.*)

Plaintiff contends that here, "without transfer of the certificate, the contract was not fully performed and remained executory." But this case is nothing like *Robbins,* and plaintiff omits pertinent observations by the court. "[I]n all cases physical delivery of the certificates is not necessary to effectuate the transfer of title to shares of stock." (*Robbins, supra*, 8 Cal.2d at p. 275, citing cases; see *ibid.* ["[U]nder some circumstances title to shares of stock may pass without delivery of the certificates."].) *Robbins* does not support plaintiff's argument that the alleged contract to purchase another nine shares was not breached until

20 years after Tari allegedly paid for the shares without receiving a certificate.

*Leven v. Legarra* (1951) 103 Cal.App.2d 319 does not assist plaintiff either. The court observed that "the intent ordinarily is that a contract for the sale of stock is performed and title to the shares transferred upon delivery of the stock." (*Id.* at p. 321.) In *Leven,* the stock was sold in violation of California securities law, there was an attempt to evade California law by mailing a certificate to Nevada and then remailing it to California, and the only question was whether the court erred in finding the sale was made in California. (*Id.* at pp. 319–320.)

Neither *Robbins* nor *Leven* has any application here, except to show, as the trial court observed, "that delivery of a stock certificate is <u>performance</u> of a stock sale." Neither case discusses when the obligation to deliver share certificates arises. Here, defendant allegedly failed to perform by not delivering a share certificate. "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed." (Civ. Code, § 1657.) "If the act is in its nature capable of being done instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained." (*Ibid.*)

Defendant's obligation to perform arose when Tari allegedly paid for the shares in 1992. This is not a case where the defendant "has promised to do an act in the future" and therefore does not violate his agreement "unless and until" a demand for performance is made and refused. (*Leonard v. Rose* (1967) 65 Cal.2d 589, 592.) This alleged transaction was a payment for shares that could have been delivered immediately

but were not.  The trial court correctly concluded the four-year statute of limitations had run.

## DISPOSITION

The judgment is affirmed.  Defendant shall recover her costs on appeal.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.